SHERMAN DUNCAN, ALIAS JAMES FITZ AND CORNELL
SMITH *v.* STATE OF MARYLAND

[No. 967 (On Remand), September Term, 1974.]

*Decided December 28, 1976.*

The cause was argued before MORTON, THOMPSON and
MOYLAN, JJ.

*Dennis M. Henderson, Assistant Public Defender,* with whom were *Alan H. Murrell, Public Defender,* and *Arnold M. Zerwitz, Assistant Public Defender,* on the brief, for appellants.

*Arrie W. Davis, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Robert S. Rothenhoefer, State's Attorney for Frederick County,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

The appellants, Sherman Duncan (alias James Fitz) and Cornell Smith, were jointly arrested in Frederick County on June 18, 1973. They were jointly charged in a two-count indictment with (1) grand larceny and (2) receiving stolen goods. Although both ultimately elected court trials, a difficulty in arranging for legal representation by Duncan resulted in a trial severance. Smith was tried in the Circuit Court for Frederick County by Judge Robert E. Clapp, Jr., on January 22, 1974, and was found guilty of the first count, charging grand larceny. Duncan was tried in the Circuit Court for Frederick County by Judge Ralph G. Shure on January 24, 1974, two days later, and was found guilty of the second count, charging the receipt of stolen goods. Notwithstanding the separate trials, the evidence produced was so virtually identical and the issues here presented are so overlapping in significant part, that it serves the purpose of judicial husbandry to consolidate the consideration of these appeals within a single opinion. Any minor differences in the relevant testimony will be noted.

The key contention raised by each defendant is that the stolen goods were turned up by the police in the course of an allegedly unconstitutional search of the automobile with which both appellants were linked by several witnesses. Duncan, in the course of his trial, moved to suppress the fruits of that search. His motion was denied. Smith, by a written motion filed just before his trial commenced, moved to suppress the physical evidence. His motion recited:

"1. That your Petitioner was arrested on a public

street in the City of Frederick, Maryland without an arrest warrant. That the police after arresting the Petitioner proceeded to search a car in which Petitioner was a passenger and without the Petitioner's permission or with a search warrant.

2. That evidence was illegally seized by the police and should not be introduced at trial."

Evidence bearing on the motion was adduced during the course of the trial. Smith's motion was also denied.

Both appellants initially appealed their convictions to this Court. In *Duncan and Smith v. State,* 27 Md. App. 302, 340 A. 2d 722, we affirmed. Our affirmance was based upon our conclusions (1) that neither appellant had demonstrated standing to contest the warrantless search of the automobile and (2) that they could not avail themselves of the automatic standing of *Cecil Jones v. United States,* 362 U. S. 257, 80 S. Ct. 725, 4 L.Ed.2d 697 (1960), because of our belief that the very notion of automatic standing had been eroded to the point of extinction by the Supreme Court's later decision in *Simmons v. United States,* 390 U. S. 377, 88 S. Ct. 967, 19 L.Ed.2d 1247 (1968). In *Duncan and Smith v. State,* 276 Md. 715, 351 A. 2d 144, the Court of Appeals reversed our decision, holding that automatic standing was still the constitutional law of the land. The Court of Appeals remanded the case to us to determine the search and seizure issue upon its merits.

It is axiomatic, of course, that the resolution of the standing question, either in favor of the appellants or in favor of the State, has no bearing upon the ultimate decision upon the Fourth Amendment merits. Standing is simply the key to the courtroom, giving one access to the adjudicative process but not foretelling success or failure as a result of that process. Because it is now the law of the case that both appellants have standing, they are entitled to litigate the Fourth Amendment merits and we turn our attention, therefore, to the merits.

The victimized store in this case, Montgomery Ward's, is located in the Fredericktown Mall on the north side of U.S.

Route 40 just west of the city of Frederick. Until several bags of stolen merchandise still containing the price tags were recovered by the police from the trunk of a white Mercury at approximately 5 p.m. on June 18, 1973, the personnel at Montgomery Ward's did not realize that a larceny had taken place. The security personnel at the nearby J. C. Penney store, also located in the Fredericktown Mall, were, however, very alert to an attempted larceny of their merchandise at approximately 4 p.m. Two Negro males had been observed putting clothing into big trash bags and then carrying them out of the store, where they were set in trash cans just outside of a Pappy's Restaurant. A security officer took up a surveillance point to observe whoever might come by to retrieve the merchandise temporarily "stashed" in the trash cans. He observed two Negro males approach in a white Mercury, with a damaged front end, and bearing Maryland license tags KR 4679. When they, in turn, observed him, they drove off at a high rate of speed, "laying down rubber." The police were immediately notified.

Mrs. Mary Joan Maher lived on Grove Hill Road, a residential cul-de-sac, located just south of U.S. 40 across from the entrance to the Fredericktown Mall. At approximately 4 p.m. on June 18, she observed a white Mercury drive off the road and park on her front lawn. Two Negro males, strangers to her, alighted from the car, turned away when they saw her looking out of the door, and walked back toward Route 40. She notified the police. The two appellants were ultimately arrested as they were walking along the road several hundred yards away. Mrs. Maher and another neighbor identified them as the occupants of the white Mercury. The Mercury was the car that had been observed a few minutes earlier by the security officer of J. C. Penney's.

A warrantless search of the trunk of the automobile produced the goods stolen from Montgomery Ward's. This was the corpus delicti. The two witnesses from Grove Hill Road (with a peripheral assist from the security man at J. C. Penney's and the proximities of time and place) established the criminal agency of the appellants. The entire case hinges

upon the question of whether the police, upon the merits of the Fourth Amendment, were or were not acting reasonably when they conducted the warrantless search of the trunk of the automobile.

We hold that the police action was not unreasonable and that the stolen goods produced from the automobile trunk were properly admitted in evidence. The police were summoned to Grove Hill Road by a resident of that street who complained about the white Mercury. The Mercury was parked not upon the street but as Mrs. Maher testified, "on her front lawn."

We believe that the police action was ultimately reasonable for either of two different reasons. There is emanating from the recent Supreme Court decisions of *Cady v. Dombrowski*, 413 U. S. 433, 93 S. Ct. 2523, 37 L.Ed.2d 706 (1973), *Cardwell v. Lewis*, 417 U. S. 583, 94 S. Ct. 2464, 41 L.Ed.2d 325 (1974), and *South Dakota v. Opperman*, 428 U. S. 364, 96 S. Ct. 3092, 49 L.Ed.2d 1000 (1976), the new constitutional notion that the police have a "community caretaking function" with respect to automobiles which bears upon the question of Fourth Amendment reasonableness. The general philosophy of the Supreme Court in this regard was stated by Justice Rehnquist in *Cady v. Dombrowski*, at 413 U. S. 441:

> "Because of the extensive regulation of motor vehicles and traffic, and also because of the frequency with which a vehicle can become disabled or involved in an accident on public highways, the extent of police-citizen contact involving automobiles will be substantially greater than police-citizen contact in a home or office. Some such contacts will occur because the officer may believe the operator has violated a criminal statute, but many more will not be of that nature. Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as

community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute."

The *Cady v. Dombrowski* opinion went on to point out that when "community caretaking" was involved, the warrantless police activity was not based exclusively upon the predicate of exigency arising out of mobility under the Carroll Doctrine. The Court drew the distinction, at 413 U. S. 441-442:

"Although the original justification advanced for treating automobiles differently from houses, insofar as warrantless searches of automobiles by federal officers was concerned, was the vagrant and mobile nature of the former ... warrantless searches of vehicles by state officers have been sustained in cases in which the possibilities of the vehicle's being removed or evidence in it destroyed were remote, if not nonexistent."

Even more pertinent to the factual situation now before us are the words of Chief Justice Burger, writing for the majority of the Supreme Court, in *South Dakota v. Opperman*, at 49 L.Ed.2d 1005:

"In the interests of public safety and as part of what the Court has called 'community caretaking functions,' *Cady v. Dombrowski, supra* ... automobiles are frequently taken into police custody. Vehicle accidents present one such occasion. To permit the uninterrupted flow of traffic and in some circumstances to preserve evidence, disabled or damaged vehicles will often be removed from the highways or streets at the behest of police engaged solely in caretaking and traffic-control activities. Police will also frequently remove and impound automobiles which violate parking ordinances and which thereby jeopardize both the public safety and the efficient movement

of vehicular traffic. The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge."

In the situation now before us, where a homeowner has called the police to make a complaint, the taking of the automobile into police custody because it is illegally parked upon a woman's front lawn is as compellingly reasonable as the taking of an automobile into police custody after it has been damaged at an accident scene. The present case of getting the automobile off of the lawn is more compelling than the impounding of a vehicle which has violated the parking ordinances. In *South Dakota v. Opperman, supra*, the Supreme Court went on to list three legitimate purposes which serve to make reasonable police intrusions into the interior of an automobile following its seizure. With respect to the third of these, the Court said, at 49 L.Ed.2d 1005:

"In addition, police frequently attempt to determine whether a vehicle has been stolen and thereafter abandoned.

These caretaking procedures have almost uniformly been upheld by the state courts, which by virtue of the localized nature of traffic regulation have had considerable occasion to deal with the issue."

In the case at bar, the police had good cause to check further in an effort to ascertain if the vehicle had "been stolen and left abandoned." As we ourselves pointed out in this regard when the case was first before us:

"Indeed, the somewhat bizarre leaving of the automobile on a front lawn in a strange residential neighborhood and then walking an appreciable distance away with no discernible destination is at least as compatible with abandoning a 'hot' car as with the sensible parking of a car rightfully possessed." 27 Md. App. at 308.

Our conclusion that the police had no choice but to take charge of the vehicle in their "community caretaking function" is fortified by the responses they received when they initially accosted the appellants. At the trial of Duncan, Lt. Gary Heerd testified that the two appellants affirmatively disclaimed any interest in or knowledge of the car:

"I myself asked them if this was their vehicle or if they knew whose vehicle it was and they denied it. They said it was not their car. They did not know whose it was or how it got there."

Similar testimony was produced at the trial of Smith. Pvt. Maybush testified:

". . . Lt. Heerd came up and asked the subjects, was it their vehicle and if they had any knowledge how the vehicle got there and both of them stated that it was positively not their vehicle. They had never seen it before.

Q. What did they state?

A. They said positively it was not their vehicle and they had never seen it before. Didn't know how it got there.

Q. They had no knowledge of that vehicle?

A. No, sir."

Lt. Heerd again testified:

"When they were brought to the scene of the car I myself asked them whether, in fact, that was their car or if they knew whose car it was. They denied it. They did not know whose car it was or who had the car."

Det. Corp. Himes also testified:

"[A]t the time they denied any knowledge of the car that was parked in the yard. They repeatedly stated that they had no connection with it, had not driven

it there, had not parked it there and answers of that nature."

Neither appellant took the stand. Neither appellant at any time offered any evidence to contradict that given by the State.

Those responses made by the two appellants to the police persuade us, furthermore, that the police action was reasonable upon yet a second and independent ground — that of abandonment. The case law dealing with the subject of abandonment makes it clear that abandonment within the contemplation of the Fourth Amendment is not the same and is not so strict as abandonment within the contemplation of property law. As was held in *United States v. Edwards*, 441 F. 2d 749 (5th Cir. 1971), at 753:

"Whether or not the facts reveal a complete abandonment in the strict property-right sense is not the issue. Mr. Justice Frankfurter in *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), admonishes that it is unnecessary and ill-advised to import into this law of constitutional search and seizure the subtle distinctions of private property law. Mr. Justice Goldberg in *United States v. Ventresca*, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965), stresses that the Fourth Amendment is not to be applied in a hypertechnical manner but with a common sense approach.

It seems clear by any good sound ordinary sense standard that Edwards abandoned any reasonable expectation to a continuation of his personal right against having his car searched under these circumstances, and thus lost his Fourth Amendment rights, and we so hold."

And see Mascolo, *The Role of Abandonment in the Law of Search and Seizure: An Application of Misdirected Emphasis*, 20 Buffalo L. Rev. 399 (1971), at 402:

"It [abandonment] is ordinarily a question of fact, is never presumed, and does not require the

performance of any ritual. Ultimately, it is a question of *intent*. Since, however, the conclusive effect of abandonment under the fourth amendment is the termination of an individual's right, or expectation, of privacy in a particular piece of property, its existence is finally a question of federal constitutional law, and not one governed by local property concepts."

In the *United States v. Edwards* case, the defendant, in his automobile, attempted to flee when a traffic officer tried to stop him for speeding. After a high-speed chase, the defendant missed a turn, ran partially off of the roadway and brought his car to a stop. He jumped out of the car and fled on foot. The officer searched the automobile and recovered contraband. In sustaining the warrantless automobile search, the United States Court of Appeals for the Fifth Circuit held, at 751, 753:

"Defendant's right to Fourth Amendment protection came to an end when he abandoned his car to the police, on a public highway, with engine running, keys in the ignition, lights on, and fled on foot. At that point defendant could have no reasonable expectation of privacy with respect to his automobile.

. . .

The circumstances here were not sufficiently compelling to make involuntary the choice to abandon his car to the pursuing officer. Having done so, Edwards accepted the risk that the officer would search the car, thus losing his right to constitutional protection."

In *Jefferson v. State*, 136 Ga. App. 63, 220 S.E.2d 71 (1975), a suspect was stopped by the police for non-possession of a driver's license. He told the officer that the license was at his brother's house and the officer followed him to that address in order to see the license. When they arrived at their destination, the defendant

jumped out of his vehicle, ran around a corner, leaped a fence and got away. The officer searched the automobile that had been left behind. In sustaining the reasonableness of that warrantless automobile search, the Georgia Court of Appeals said, at 220 S.E.2d 73:

> "The facts show that appellant made a free choice to leave his car on the street. 'By this voluntary election, he lost his constitutional protection against the search and seizure of his car.' "

See also *Whitlock v. State*, 124 Ga. App. 599, 185 S.E.2d 90 (1971), and *State v. Achter*, 512 S.W.2d 894 (Mo. App. 1974).

Under factual circumstances even more apposite to the case at bar, *United States v. Colbert*, 474 F. 2d 174 (5th Cir. 1973), found abandonment where the defendants disclaimed any interest in the briefcases to be searched. Two defendants were convicted of the unlawful possession of sawed-off shotguns. They were both stopped for questioning as they walked the streets of Birmingham, Alabama, carrying briefcases. They set the briefcases down on the sidewalk. In response to questioning, they identified themselves as book salesmen. When the officers asked to see their wares, the defendants denied that they owned the two briefcases and said they had no knowledge about them. They began to walk away, leaving the briefcases on the sidewalk. The briefcases were warrantlessly searched by the police and revealed the sawed-off shotguns inside. In holding that the police conduct was reasonable, the United States Court of Appeals said, at 176-177:

> "The issue is not abandonment in the strict property-right sense, but whether the person prejudiced by the search had voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search. . . .
>
> The facts of this case show conclusively that Colbert and Reese abandoned their briefcases

> before the searches took place. In response to police questions they both disclaimed any interest in the briefcases and began to walk away from them. The police officers in no way compelled these actions. Under these circumstances appellants could entertain no reasonable expectation of privacy in them. Compare *Lurie v. Oberhauser, supra,* where a disclaimer of any ownership or possessory interest in a suitcase in the course of a police investigation was held sufficient without more to support a finding of abandonment."

See also *Lurie v. Oberhauser,* 431 F. 2d 330 (9th Cir. 1970), and *State v. Brown,* 45 Ohio App. 2d 76, 341 N.E.2d 325 (1975).

As the Supreme Court made unmistakably clear in *Stone v. Powell,* 428 U. S. 465, 96 S. Ct. 3037, 49 L.Ed.2d 1067 (1976), the sole purpose of the exclusionary rule, reluctantly imposed at the cost of probative evidence, is to deter unreasonable police behavior. The ultimate touchstone is reasonableness. Upon either the rationale of their "community caretaking function" or the rationale of abandonment, we hold that the police conduct in the circumstances of this case was reasonable. The physical fruits of grand larceny found in the trunk of the abandoned and/or intrusively, as well as illegally, parked automobile were, therefore, properly admitted in evidence.

*Judgments affirmed; costs to be paid by appellants.*