SHERMAN DUNCAN, ETC. AND CORNELL
SMITH *v.* STATE OF MARYLAND

[No. 24, September Term, 1977.]

*Decided October 27, 1977.*

248

Motion for reconsideration filed November 28, 1977; denied December 5, 1977.

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, LEVINE, ELDRIDGE and ORTH, JJ.

*Dennis M. Henderson, Assistant Public Defender,* with whom were *Alan H. Murrell, Public Defender,* and *George E. Burns, Jr., Assistant Public Defender,* on the brief, for appellants.

*Alexander L. Cummings, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Clarence W. Sharp* and *Arrie W. Davis, Assistant Attorneys General,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

The Grand Jury for Frederick County returned a true bill against Cornell Smith, alias James Fitz, and Sherman Duncan (appellants), jointly, presenting that they did unlawfully steal (1st count) and receive (2nd count) goods of Montgomery Ward and Company, Inc. of a value in excess of $100. At separate bench trials in the Circuit Court for Frederick County, Smith was convicted under the 1st count and Duncan under the 2nd count. In each trial a motion to suppress the stolen goods as seized upon an unlawful search of an automobile was denied and the evidence was admitted. Maryland Rule 729. Smith and Duncan appealed from the respective judgments entered, and the two appeals were submitted to the Court of Special Appeals in one record. Each appellant attacked the denial of his motion to suppress. The Court of Special Appeals affirmed the

judgments in a single opinion, concluding with respect to the search and seizure issue that appellants had not demonstrated standing to contest the search and seizure and that the "automatic standing" rule of *Jones v. United States,* 362 U. S. 257, 80 S. Ct. 725 (1960) was not available to them because *Simmons v. United States,* 390 U. S. 377, 88 S. Ct. 967 (1968) had eroded that rule to the point of extinction. *Duncan and Smith v. State,* 27 Md. App. 302, 310-325, 340 A. 2d 722 (1975). On review by way of certiorari we disagreed. We held that automatic standing was still the constitutional law of the land and applicable to appellants. We remanded the case with direction that the Court of Special Appeals determine "whether the evidence in question was properly admitted." *Duncan and Smith v. State,* 276 Md. 715, 716, 351 A. 2d 144 (1976). The Court of Special Appeals then held that the motions to suppress the evidence were properly denied and affirmed the judgments. *Duncan v. State,* 34 Md. App. 267, 366 A. 2d 1058 (1976). We granted appellants' petition for the issuance of a writ of certiorari.

The question presented on review is the propriety of the denial of the motions to suppress the challenged evidence. The answer to the question lies in the determination of whether the evidence was obtained by the police in violation of the guarantees of the Fourth Amendment to the Constitution of the United States. As in all Fourth Amendment cases, we are obligated to look to all the facts and circumstances of this case in light of the principles set forth in decisions of the Supreme Court of the United States. *South Dakota v. Opperman,* 428 U. S. 364, 375, 96 S. Ct. 3092 (1976). "[W]hether a search and seizure is unreasonable within the meaning of the Fourth Amendment depends upon the facts and circumstances of each case. . . ." *Cooper v. California,* 386 U. S. 58, 59, 87 S. Ct. 788 (1967).

## THE FACTS

The facts material to the question of the admissibility of the challenged evidence were submitted to us by an agreed statement included in appellants' brief and supplemented in

small part in the brief of the State. Maryland Rule 828 g. We summarize.

The events leading to the conviction of appellants began in the late afternoon of 18 June 1973 when two unidentified customers of the J. C. Penney Store in the Fredericktowne Mall in Frederick County told a sales clerk that "two black men had stuffed clothing from the store into plastic bags and put the bags in trash cans on the parking lot next to a nearby restaurant." The clerk gave this information to a store security guard who placed the trash cans under surveillance. Around 4:00 p.m. he saw "a white Mercury containing two black men stop near the trash cans momentarily and then speed away." He reported the incident, including a description of the automobile and its license number, to Officer Kirby Maybush of the Frederick City Police Department, who was at the store investigating a shoplifting complaint. Maybush had the description of the automobile broadcast over the police radio network with the request that if the car "was spotted, to stop it, that I wanted to talk to the subjects in reference to possible stolen clothing." He was informed by the Department of Motor Vehicles that the automobile was registered in the name of Shirley Ann Duncan of Baltimore, and, on further check he learned that it had not been reported stolen.

Mary Jo Maher lived on Grove Hill Road in Frederick County near the point at which the road "joins U. S. Route 40 directly across from the Fredericktowne Mall." About 4:00 p.m. on 18 June 1973 she saw an automobile pull off Grove Hill Road (there were no curbs or sidewalks) "and park by the side of the road on her property." Appellants got out of the vehicle and walked away. "Suspicious about the presence of the two unfamiliar black men in the neighborhood, she called the State Police, who responded within moments." The automobile on the Maher lawn was the one described in the lookout broadcast. A State Trooper searched the automobile for a registration card but did not find one.

Maybush, cruising around looking for the automobile, received word over the radio of its whereabouts. He went to

the scene, and shortly thereafter his superior, Lt. Gary Heerd, arrived. The two officers conferred, and Maybush went to the Mall parking lot to look for the suspects. Ten or fifteen minutes later he saw appellants. They left the parking lot, crossed Route 40 and walked up Grove Hill Road toward the automobile. "He radioed this information to Lt. Heerd and the two officers converged on the appellants, arrested them at gunpoint on suspicion of larceny, handcuffed them and placed them in a patrol car. They identified themselves as James Fitz and Sherman Duncan. They were driven a short distance to the Maher property where, at 4:30 p.m., Mrs. Maher identified them as the men she saw getting out of the car. Both appellants denied any connection with the automobile." They said it was not their car, that they did not know whose it was or who had it or how it got there. They declared that they had never seen it before. As one witness put it: "[A]t the time they denied any knowledge of the car that was parked in the yard. They repeatedly stated they had no connection with it, had not driven it there, and had not parked it there and answers of that nature." They were taken to police headquarters.

Heerd sent for a Frederick City Police Department Criminal Investigation Division (C.I.D.) unit. "He said he did not search the car when he first arrived on the scene '[d]ue to the fact I had reason to believe it might have been used in a crime and I wasn't going to have the car searched until I had C.I.D. men come and check for fingerprints or for whatever might have taken place at that time.'" Detective Corporal George Himes, Jr. was the C.I.D. man who responded. He was given all the information known to the police at that time and briefed on what action had been taken. "[T]here had been a previous larceny from J. C. Penney's store and that a suspected vehicle in the theft had been found parked in front of the Maher property on the lawn." The police had detained "two colored male subjects which were seen acting in a suspicious manner in the area and that these two colored male subjects denied any connection with the vehicle as to owning it," and that they had identified themselves as James Fitz and Sherman

Duncan. The automobile had not been reported stolen and was registered in the name of Shirley Ann Duncan. Although the police had been unable to reach her by telephone, a message had been left at her home to call the Frederick City Police Department. A registration card had not been found upon a check of the automobile by a State Trooper. "Himes entered the car, searched the glove box, overhead visors, console between the bucket seats and under the seats. He found the keys under the driver's seat and then proceeded to the trunk and opened it." He vowed that "the search of the car was not made pursuant to his investigation of the larceny at J. C. Penney and that the larceny played no part in his decision to search. He said he felt that it was either a stolen or abandoned vehicle and he entered the trunk to 'verify ownership of the vehicle' and 'to secure the vehicle, to check the vehicle for valuables and for all types of items to be secured into our possession until the owner can be contacted.' "

The evidence which served as the basis of the charges against appellants and their convictions was found in the trunk. When Himes unlocked and raised the trunk lid he saw two large green heavy duty plastic trash bags. "A couple pieces of clothing were protruding from the bags. On one piece there was attached a two-part Montgomery Ward tag with both parts intact." Himes knew that when an article is purchased at Montgomery Ward the parts of the tag "are separated. One piece stays with the article and one piece stays with the store." The bags and clothing were seized. Himes testified that he did not know then that the items had been stolen from Montgomery Ward, as was later established, but, he declared, he had "reasonable suspicions they were."

Upon these facts and circumstances the Court of Special Appeals thought that "[t]he entire case hinge[d] upon the question of whether the police, upon the merits of the Fourth Amendment, were or were not acting reasonably when they conducted the warrantless search of the trunk of the automobile." *Duncan v. State, supra,* 34 Md. App. at

270-271. It held that the police action was not unreasonable. It based that holding on alternative grounds. It believed that the police action was "ultimately reasonable" either because it was authorized under a "new constitutional notion that the police have a 'community caretaking function' with respect to automobiles which bears upon the question of Fourth Amendment reasonableness," *id.* at 271, or because the automobile had been abandoned, *id.* at 275. We shall ascertain the law relating to each ground and look to all the facts and circumstances in light of it.

## THE LAW

### The Fourth Amendment and Police Community Caretaking Functions

The Fourth Amendment to the Constitution of the United States provides that

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.[1]

---

1. As we have indicated, the Court of Special Appeals decided the case on the belief that the action of the police was to be tested under Fourth Amendment strictures. We accept this for the purpose of decision, noting, however, that the Supreme Court has not squarely decided that the taking of an inventory by the police under their community caretaking function is characterized as a "search." In South Dakota v. Opperman, 428 U. S. 364, 96 S. Ct. 3092 (1976), Burger, C.J. delivered the opinion of the Court, in which Blackmun, Powell, Rehnquist, and Stevens, JJ. joined. Powell, J. filed a concurring opinion. White, J. filed a dissenting statement. Marshall, J. filed a dissenting opinion, in which Brennan and Stewart, JJ. joined. The Court's opinion spoke of the conclusion of some state courts, applying the Fourth Amendment standard of reasonableness, that "even if an inventory is characterized as a 'search,' the intrusion is constitutionally permissible." *Id.* at 370-371. It observed that some courts have concluded that an inventory does not constitute a search for Fourth Amendment purposes and others have expressed doubts as to whether the intrusion is classifiable as a search. It noted that the "Petitioner, however, has expressly abandoned the contention that the inventory in this case is exempt from the Fourth Amendment standard of reasonableness." *Id.* note 6, at 370. Powell, J., concurring, considered the inventory procedure to be a search. *Id.* note 1, at 377. The dissenting opinion by Marshall, J. deemed the inventory taking to be a search in the contemplation of the Fourth Amendment. *Id.* note 2, at 385.

"The basic purpose of this Amendment . . . is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Camara v. Municipal Court,* 387 U. S. 523, 528, 87 S. Ct. 1727 (1967). To this end, "[t]he mandate of the Fourth Amendment is that the people shall be secure against *unreasonable* searches." *United States v. Rabinowitz,* 339 U. S. 56, 65, 70 S. Ct. 430 (1950). The standard of reasonableness embodied in the Fourth Amendment "turns, at least in part, on the more specific commands of the warrant clause," *United States v. United States District Court,* 407 U. S. 297, 315, 92 S. Ct. 2125 (1972), and a search warrant, by the express terms of the Amendment, may issue only upon "probable cause." "Thus the most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions.' " [2] *Coolidge v. New Hampshire,* 403 U. S. 443, 454-55, 91 S. Ct. 2022 (1971). *See Katz v. United States,* 389 U. S. 347, 357, 88 S. Ct. 507 (1967); *Jones v. United States,* 357 U. S. 493, 499, 78 S. Ct. 1253 (1958); *United States v. Jeffers,* 342 U. S. 48, 51, 72 S. Ct. 93 (1951); *McDonald v. United States,* 335 U. S. 451, 456, 69 S. Ct. 191 (1948).

The search of an automobile is one of the class of carefully defined cases which constitutes at least a partial exception to the general rule that a search of private property without proper consent is "unreasonable" unless it has been authorized by a valid search warrant. *Cady v. Dombrowski,* 413 U. S. 433, 439, 93 S. Ct. 2523 (1973). Although automobiles are "effects" in the contemplation of the Fourth Amendment, "there is a constitutional difference between houses [or offices] and cars." *Chambers v. Maroney,* 399 U. S. 42, 52, 90 S. Ct. 1975 (1970). *South Dakota v. Opperman,*

---

**2.** The concurring opinion of Powell, J. in South Dakota v. Opperman, 428 U. S. 364, note, 10 at 382 cited United States v. Mapp, 476 F. 2d 67, 76 (2nd Cir. 1973) as listing then-recognized exceptions to warrant requirement: (i) hot pursuit; (ii) plain view doctrine; (iii) emergency situation; (iv) automobile search; (v) consent; and (vi) incident to arrest.

*supra,* 428 U. S. at 367-68, points out the twofold reason for this distinction. "First, the inherent mobility of automobiles creates circumstances of such exigency that, as a practical necessity, rigorous enforcement of the warrant requirement is impossible. *Carroll v. United States,* 267 U. S. 132, 153-54 (1925); *Coolidge v. New Hampshire,* 403 U. S. 443, 459-60 (1971)." Second, "less rigorous warrant requirements govern because the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office." *Opperman* at 367. This is so because "[i]n discharging their varied responsibilities for ensuring the public safety, law enforcement officials are necessarily brought into frequent contact with automobiles." *Id.* at 367-68. Further, "[o]ne has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects. . . . It travels public thoroughfares where both its occupants and its contents are in plain view." *Cardwell v. Lewis,* 417 U. S. 583, 590, 94 S. Ct. 2464 (1974).

The ofttimes police-citizen contact involving automobiles was recognized in *Cady v. Dombrowski, supra,* 413 U. S. at 441:

> Because of the extensive regulation of motor vehicles and traffic, and also because of the frequency with which a vehicle can become disabled or involved in an accident on public highways, the extent of police-citizen contact involving automobiles will be substantially greater than police-citizen contact in a home or office. Some such contacts will occur because the officer may believe the operator has violated a criminal statute, but many more will not be of that nature. Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as *community caretaking functions,* totally divorced from the detection, investigation, or acquisition of

evidence relating to the violation of a criminal statute. (Emphasis added).

Inventory searches of automobiles are frequently made pursuant to these "community caretaking functions." It seems, however, that none of the Supreme Court decisions was dispositive of the issue whether the Fourth Amendment permits such routine inventory searches of automobiles. *See South Dakota v. Opperman, supra,* 428 U. S. at 377 (Powell, J. concurring). The Court's opinion in *Opperman,* however, stated that the holdings in *Cooper v. California, supra, Harris v. United States,* 390 U. S. 234, 88 S. Ct. 992 (1968), and *Cady v. Dombrowski, supra,* pointed the way. And it found that the state courts "overwhelmingly" and a majority of the Federal Courts of Appeals have sustained inventory procedures as reasonable police intrusions. *Opperman* at 370-75. The opinion of the Court in *Opperman* found, on the record of that case, that the inventory search was not "unreasonable" under the Fourth Amendment. *Id.* at 376. Its reasoning followed these lines. Activities concerning automobiles carried out by local police officers in the interests of public safety and as "community caretaking functions" frequently result in the automobile being taken in custody. "Vehicle accidents present one such occasion. To permit the uninterrupted flow of traffic and in some circumstances to preserve evidence, disabled or damaged vehicles will often be removed from the highways or streets at the behest of police engaged solely in caretaking and traffic-control activities. Police will also frequently remove and impound automobiles which violate parking ordinances and which thereby jeopardize both the public safety and the efficient movement of vehicular traffic. The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge." *Id.* at 368-69. It is the legal impoundment of an automobile which permits the inventory search of the vehicle. "When vehicles are impounded, local police departments generally follow a routine practice of securing and inventorying the automobiles' contents." *Id.* at

369. These procedures developed in response to three distinct needs: (i) protection of the police from danger; (ii) protection of the police against claims and disputes over lost or stolen property; and (iii) protection of the owner's property while it remains in police custody. "In addition," the Court observed, "police frequently attempt to determine whether a vehicle has been stolen and thereafter abandoned." *Id.* at 369.

So it is that a search of an automobile meeting the requirements of an inventory search need not be justified by "probable cause." That standard "is peculiarly related to criminal investigations, not routine, noncriminal procedures. . . . In view of the noncriminal context of inventory searches, and the inapplicability in such a setting of the requirement of probable cause, courts have held — and quite correctly — that search warrants are not required, linked as the warrant requirement textually is to the probable-cause concept . . . . With respect to noninvestigative police inventories of automobiles lawfully within governmental custody . . . the policies underlying the warrant requirement . . . are inapplicable." *Id.* note 5, at 370.

*Opperman* did not definitively establish the permissible scope of the inventory search. It stated that cases decided by the Federal Courts of Appeals "have recognized that standard inventories often include an examination of the glove compartment, since it is a customary place for documents of ownership and registration . . . as well as a place for the temporary storage of valuables." *Id.* at 372. It noted that the inventory there conducted was not unreasonable in scope. "[O]nce the policeman was lawfully inside the car to secure the personal property in plain view, it was not unreasonable to open *the unlocked glove compartment,* to which vandals would have had ready and unobstructed access once inside the car." *Id.* note 10, at 376 (emphasis added). Powell, J. in his concurring opinion carefully pointed out that "[a]s the Court's opinion emphasizes, the search here was limited to an inventory of the unoccupied automobile and was conducted strictly in accord with the regulations of the Vermillion Police

Department." *Id.* at 380. He noted, at 380, note 6: "A complete 'inventory report' is required of all vehicles impounded by the Vermillion Police Department. The standard inventory consists of a survey of the vehicle's exterior — windows, fenders, trunk, and hood — apparently for damage, and its interior, to locate 'valuables' for storage. As part of each inventory a standard report form is completed. The report in this case listed the items discovered in both the automobile's interior and the unlocked glove compartment. The only notation regarding the trunk was that it was locked. A police officer testified that all impounded vehicles are searched, that the search always includes the glove compartment, and that the trunk had not been searched in this case because it was locked." The dissenting opinion of Marshall, J. observed, at 385, note 1: "The Court does not consider, however, whether the police might open and search the glove compartment if it is locked, or whether the police might search a locked trunk or other compartment." In *Cady v. Dombrowski, supra*, the Court held that the search of an automobile trunk during a caretaking search and the seizure of a gun therefrom was, not unreasonable. But the Court made clear that the officer reasonably believed that the trunk contained a gun and that the trunk was vulnerable to intrusion by vandals. *Id.* at 448. *See also id.* at 436-437.

Despite the narrowness of the *Opperman* holding, necessarily restricted to the facts of that case,[3] there emerges from the Court's opinion a doctrine, viable even

3. "The ... police were indisputably engaged in a caretaking search of a lawfully impounded automobile .... The inventory was conducted only after the car had been impounded for multiple parking violations. The owner, having left his car illegally parked for an extended period, and thus subject to impoundment, was not present to make other arrangements for the safekeeping of his belongings. The inventory itself was prompted by the presence in plain view of a number of valuables inside the car. As in *Cady*, there is no suggestion whatever that this standard procedure, essentially like that followed throughout the country, was a pretext concealing an investigatory police motive.

"On this record we conclude that in following standard police procedures, prevailing throughout the country and approved by the overwhelming majority of courts, the conduct of the police was not 'unreasonable' under the Fourth Amendment." South Dakota v. Opperman, 428 U. S. 364, 375-76, 96 S. Ct. 3092 (1976).

though not fully developed, which permits as reasonable by Fourth Amendment standards, the inventory search of an automobile under certain conditions. We find the present stage of the doctrine to be that the police may, without regard to probable cause, and, thus, absent a warrant, constitutionally enter an automobile and unlocked compartments therein, and inventory and seize articles found, provided the vehicle had been otherwise legally taken into police custody and the inventorying was pursuant to a standard police procedure.

## THE DECISION WITH RESPECT TO THE CARETAKING GROUND

Exercising our independent judgment on the underlying constitutional issue presented by the facts of this case, as we are obligated to do, *Cady v. Dombrowski, supra,* 413 U. S. at 443, we conclude that the seizure of the challenged evidence here cannot be held to be "reasonable" under the Fourth Amendment standard as an exercise of police caretaking functions. The procedure failed to meet the fundamental element present in all caretaking searches that the automobile be lawfully in police custody. The evidence is clear that the automobile was parked on private property, not on a public highway or street. It patently was not impeding traffic or threatening public safety and convenience. We cannot agree with the bald declaration of the Court of Special Appeals that "where a homeowner has called the police to make a complaint, the taking of the automobile into police custody because it is illegally parked upon a woman's front lawn is as compellingly reasonable as the taking of an automobile into police custody after it has been damaged at an accident scene. The present case of getting the automobile off of the lawn is more compelling than the impounding of a vehicle which has violated the parking ordinances." *Duncan v. State, supra,* 34 Md. App. at 273. The Court of Special Appeals cites no law authorizing the police, at the time of the incident here, to impound a vehicle parked on private property, and we have not been

referred to such a law.[4] Maryland Code (1957, 1970 Repl. Vol.) Art 66½, § 11-1004 (e) provided:

> No person shall stop, stand, or park a vehicle on any private property not owned by the owner or driver of the vehicle after he has been requested by the property owner, his tenant, or his agent to remove the vehicle from the premises.

There was no evidence that the property owner here requested appellants to remove the automobile. It appears that the police had no authority to impound the automobile merely because it was parked on private property without permission.

The short of it is that the search here simply did not involve a standard caretaking procedure such as has been uniformly upheld by the state and federal courts.[5] On the

---

4. Under Maryland Code (1957, 1970 Repl. Vol.) Art. 66½, § 15-102 (a) the provisions of the Vehicle Laws were not to be deemed to prevent local authorities from regulating the parking of vehicles with respect to streets and highways under their jurisdiction and within reasonable exercise of the police power. However, it was not until the enactment of Acts 1974, ch. 693, effective 1 January 1975, that every political subdivision and municipality was expressly empowered to adopt ordinances or regulations not only to regulate the parking of vehicles but also to provide for the impounding of vehicles parked in violation of the ordinances and regulations. Code (1957, 1976 Cum. Supp.) Art. 66½, § 16-109.1 (a).

5. See, for example, United States v. McCambridge, 551 F. 2d 865 (1st Cir. 1977) (statutory duty to impound because of missing identification number); Cabbler v. Superintendent, 528 F. 2d 1142 (4th Cir. 1975), cert. denied, 429 U. S. 817 (1976) (automobile constituted nuisance in driveway of hospital emergency room); United States ex rel. La Belle v. LaVallee, 517 F. 2d 750 (2nd Cir. 1975), cert. denied, 423 U. S. 1062 (1976) (vehicle removed to police garage from highway as a safety precaution due to icy condition of road); United States v. Sifuentes, 504 F. 2d 845 (4th Cir. 1974) (police had responsibility to impound vehicle); United States v. Speers, 429 F. Supp. 188 (W.D. Okla. 1977) (vehicle lawfully impounded); Banks v. United States, 287 A. 2d 85 (D.C. Ct. App. 1972) (automobile illegally parked in bus zone and driver had no operator's license); State v. Jenkins, 319 So. 2d 91 (Fla. Dist. Ct. App. 1975) (following traffic arrest, driver did not have valid operator's license, failed to produce registration card, and violation was such as required driver to post bond); People v. Clark, 357 N.E.2d 798 (Ill. Sup. Ct. 1976) (automobile broke down and stopped in traffic lane of arterial street, driver had no operator's license and was illegally transporting liquor); State v. Achter, 512 S.W.2d 894 (Mo. Ct. App. 1974) (driver fled leaving automobile standing in middle of road with door open and keys in ignition); State v. Wallen, 173 N.W.2d 372 (Neb. Sup. Ct.), cert. denied, 399 U. S. 912 (1970) (motorist arrested standing beside stalled automobile in highway intersection); People v. Sullivan, 272 N.E.2d 464 (N.Y. Ct. App. 1971)

contrary, unlike *Opperman* and *Cady*, and despite the disavowal of the searching officer, in light of the information within the knowledge of the officer and the scope of the search, there is the strong suggestion that the search was actually a pretext concealing an investigatory police motive. The Court of Special Appeals recognized in *Dixon v. State*, 23 Md. App. 19, 20-21, 327 A. 2d 516 (1974) that "[w]ith the possible exception of the 'dropsy' cases, no aspect of Fourth Amendment litigation has afflicted law enforcement with the yawning credibility gap wrought by inventory searches." That yawning credibility gap is present on this record. As the police were not indisputably engaged in a caretaking search of a lawfully impounded automobile, the search and seizure cannot be said to be reasonable under the caretaking doctrine.[6]

## THE LAW

### Abandonment and the Fourth Amendment

We start again with the basic concern of the Fourth Amendment — to protect the privacy and sanctity of one's property against arbitrary intrusion by governmental officials. However, "[w]ithout question, abandoned property does not fall within that category in which one has a legitimate expectation of privacy to bring it within the

---

(automobile legally impounded as illegally parked in "tow-away" zone); State v. Jewell, 338 So. 2d 633 (La. Sup. Ct. 1976) (vehicle illegally obstructing highway at night); Robertson v. State, 541 S.W.2d 608 (Tex. Crim. App. 1976) (automobile involved in accident and driver taken to hospital).

For examples of cases in which the search was held to be unreasonable because the automobile was not lawfully in custody of the police, *see*, People v. Landa, 106 Cal. Rptr. 329 (Cal. Ct. App. 1973); People v. Nagel, 95 Cal. Rptr. 129 (Cal. Ct. App. 1971); Virgil v. Superior Court, County of Placer, 73 Cal. Rptr. 793 (Cal. Ct. App. 1968); Pigford v. United States, 273 A. 2d 837 (D.C. Ct. App. 1971); United States v. Pannell, 256 A. 2d 925 (D.C. Ct. App. 1969); Williams v. United States, 170 A. 2d 233 (D.C. Mun. Ct. App. 1961); State v. Boster, 539 P. 2d 294 (Kan. Sup. Ct. 1975); State v. Singleton, 511 P. 2d 1396 (Wash. Ct. App. 1973).

**6.** In view of our conclusion, we do not reach the question whether, under the circumstances, the search of the trunk was unreasonable in any event. *But see* United States v. Lawson, 487 F. 2d 468 (8th Cir. 1973); City of Danville v. Dawson, 528 S.W.2d 687 (Ky. 1975). *Compare* Cady v. Dombrowski, 413 U. S. 433, 93 S. Ct. 2523 (1973).

protection of the Fourth Amendment ... ." *Everhart v. State*, 274 Md. 459, 483, 337 A. 2d 100 (1975). *See Hester v. United States*, 265 U. S. 57, 58, 44 S. Ct. 445 (1924). It is the expectation of privacy which is at the heart of the test for abandonment. " 'The proper test for abandonment is not whether all formal property rights have been relinquished, but whether the complaining party retains a reasonable expectation of privacy in the articles alleged to be abandoned.' " *Venner v. State*, 279 Md. 47, 53, 367 A. 2d 949 (1977), quoting *United States v. Wilson*, 472 F. 2d 901 (9th Cir. 1972), *cert. denied*, 414 U. S. 868 (1973). So, one who abandons property thereby surrenders any expectation of privacy therein, removes himself from the protection of the Fourth Amendment, and "cannot complain with effect of the later seizure of such property by the police, or of its use against him in court." *Henderson v. Warden*, 237 Md. 519, 523, 206 A. 2d 793 (1965); *Matthews v. State*, 237 Md. 384, 387-388, 206 A. 2d 714 (1965). "[W]hether property is abandoned is generally a question of fact based upon evidence of a combination of act and intent." *Everhart v. State, supra*, 274 Md. at 483.

There can be no doubt that the abandonment doctrine applies to automobiles. One may "abandon" or "discard" an automobile in his possession to avoid arrest or detection as he may rid himself of other incriminating articles. *People v. Smith*, 409 P. 2d 222, 237 (Cal. Sup. Ct. 1966), *cert. denied*, 388 U. S. 913 (1967), analogizing circumstances in *Abel v. United States*, 362 U. S. 217, 80 S. Ct. 683 (1960), in which evidence seized from a wastebasket in a rented room after the petitioner had vacated the room was found to have been abandoned, with the abandonment of a rented automobile. *See Hawley v. Commonwealth*, 144 S.E.2d 314, 317 (Va. Sup. Ct. App. 1965), *cert. denied*, 383 U. S. 910 (1966). Many of the cases in which the courts have dealt with the abandonment of an automobile concern flight from the vehicle on sighting the police, particularly where the occupant deserts the automobile while under "hot pursuit." *See, for example, United States v. Moody*, 485 F. 2d 531, (3rd Cir. 1973); *United States v. Edwards*, 441 F. 2d 749 (5th Cir. 1971); *Wade v.*

*Warden,* 278 F. Supp. 904 (D. Md. 1968); *Jefferson v. State,* 220 S.E.2d 71 (Ga. Ct. App. 1975); *Whitlock v. State,* 185 S.E.2d 90 (Ga. Ct. App. 1971); *People v. Harper,* 185 N.E.2d 865 (Ill. Sup. Ct. 1962), *cert. denied,* 372 U. S. 966 (1963); *State v. Barr,* 126 Vt. 112, 223 A. 2d 462 (1966). In other cases, in which sudden flight was not a circumstance, courts have found abandonment by looking to such factors as the condition of the vehicle, its location, and the length of time it has remained there. *United States v. Calhoun,* 510 F. 2d 861 (7th Cir. 1975), *cert. denied,* 421 U. S. 950 (1975); *McIntosh v. United States,* 341 F. 2d 448 (8th Cir.), *cert. denied,* 381 U. S. 947 (1965); *United States v. Angel,* 201 F. 2d 531 (7th Cir. 1953); *Croker v. State,* 150 S.E.2d 294 (Ga. Ct. App. 1966); *Hawley v. Commonwealth, supra,* all finding abandonment. *Compare People v. James,* 46 Misc. 2d 138, 259 N.Y.S.2d 241 (N.Y. Sup. Ct. 1965), holding that the mere presence of an automobile at a specified location for two days did not constitute abandonment.

The abandonment doctrine is not without limitations. It does not apply when the abandonment was the result of an unlawful police action. *Beale v. State,* 230 Md. 182, 186 A. 2d 213 (1962). *See Hobson v. United States,* 226 F. 2d 890 (8th Cir. 1955); *Glover v. State,* 14 Md. App. 454, 287 A. 2d 333 (1972), *cert. denied,* 265 Md. 737 (1972).[7]

Because Fourth Amendment concerns are not applicable when an automobile is in fact abandoned, it may be seized by the police without a warrant and examined with no limitations on the scope, intensity, or objectives of the examination. It and its contents may be retained for use as evidence otherwise admissible against the one who abandoned it.[8]

---

7. As to the doctrine of abandonment generally, *see* Mascolo, *The Rule of Abandonment in the Law of Search and Seizure: An Application of Misdirected Emphasis,* 20 Buffalo L. Rev. 399 (1971); 1 B.J. George, Criminal Procedure Sourcebook 262-265 (1976); *Search of Motor Vehicles,* 36 FBI Law Enforcement Bulletin 18-20 (December 1967).

8. For purposes of the Vehicle Laws, an "abandoned motor vehicle" is one "that is inoperable and is left unattended on public property for more than forty-eight hours, or . . . that has remained illegally on public property for a period of more than forty-eight hours, or . . . that has remained on private property without the consent of the owner or person in control of the

### THE DECISION WITH RESPECT
### TO ABANDONMENT

As we have indicated, intention is a prime factor in considering whether there has been an abandonment. Intent must be ascertained from what the actor said and did; intent, though subjective, is determined from the objective facts at hand. *Hawley v. Commonwealth, supra,* 144 S.E.2d at 317.

The case *sub judice,* on the facts as presented to us, patently does not fall within that class of cases in which abandonment was found by the act of flight in hot pursuit. Nor does it fit into those cases in which the condition of the vehicle, its location and the length of time it remained there were determinative. Although the automobile was parked on private property without permission of the owner of the property, it was by the side of a public road which contained no curbs or sidewalks. The police were notified of its presence by the property owner immediately after it was parked and the two occupants had left, apparently in the direction of the nearby shopping mall. When appellants were arrested, they were walking back toward the automobile, only a short time after the car had been parked. There is nothing to indicate to this point, that appellants, later shown to have been the occupants of the automobile, intended to abandon it.

The issue boils down to whether, in the circumstances, appellants' unequivocal disclaimer of the automobile satisfied the test for its abandonment by them. We think it

property for more than forty-eight hours." Maryland Code (1957, 1970 Repl. Vol.) Art. 66½ § 11-1002.2 (g) (2).

"A police department may take into custody any motor vehicle found abandoned. For this purpose, a police department may employ its own personnel, equipment, and facilities or hire persons, equipment, and facilities for removing, preserving, and storing abandoned motor vehicles." Code, Art. 66½, § 11-1002.1. The taking into custody, under this authority, of an automobile which was abandoned within the meaning of the Vehicle Laws may provide the legal impoundment element of the police caretaking function necessary to trigger an inventory search. Of course, the Vehicle Laws definition of an abandoned vehicle is not controlling with respect to the doctrine of abandonment. As we have indicated, abandonment under that doctrine is a question of fact based upon evidence of a combination of act and intent.

did. We find *United States v. Colbert*, 474 F. 2d 174 (5th Cir. 1973), relied on by the Court of Special Appeals, *Duncan v. State, supra*, 34 Md. App. at 277-78, to be most persuasive. The *Colbert* court's recognition of the doctrine of abandonment in regard to the Fourth Amendment is the same as ours. It said:

> Abandonment is primarily a question of intent, and intent may be inferred from words spoken, acts done, and other objective facts. . . . All relevant circumstances existing at the time of the alleged abandonment should be considered. . . . Police pursuit or the existence of a police investigation does not of itself render abandonment involuntary. . . . The issue is not abandonment in the strict property-right sense, but whether the person prejudiced by the search had voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search. *Colbert, supra*, 474 F. 2d at 176 (citations omitted).

Not only was the law in *Colbert* the same as that in this jurisdiction, but it was applied to a factual situation which was comparable to that of the case in hand. Defendants Colbert and Reese were walking down the street carrying briefcases. A police officer noticed that Colbert fit the description of a wanted suspected felon, and he and another officer approached the men to question them. At the officer's approach the defendants set their briefcases on the sidewalk. "They identified themselves as book salesmen but, when the officers asked to see their wares, i.e. the contents of the briefcases, [defendants] replied they did not have to show the officers anything and denied that they owned the briefcases or had any knowledge about them. The officers frisked Colbert and Reese. [Defendants] then began to walk away from the officers, leaving the briefcases on the sidewalk. The officers stopped them again and demanded of each to see some identification document. Reese produced a

Georgia driver's license, and Colbert said he had no identification card with him. The officers then asked each [defendant] to produce his draft card; when each denied possessing one, the officers arrested them for failure to carry a Selective Service registration certificate, a violation of 50 U.S.C.A. App. § 462, and placed them in the patrol car. While in the parked car Reese again denied knowing anything about the briefcases. One of the officers then returned to the briefcases, opened them, and found the sawed-off shotguns inside." *Id.* at 175. Defendants were indicted for possession of the unregistered shotguns with illegal barrel lengths, and, after the trial court denied their motions to suppress, they were convicted. The court found that the facts showed "conclusively" that Colbert and Reese abandoned their briefcases before the searches took place. Their words and acts were in no way compelled by the police. Under the circumstances the defendants could entertain no reasonable expectation of privacy in the briefcases. Therefore, the search and seizure did not violate the Fourth Amendment and the evidence was admissible. *Id.* at 177. *See United States v. Edwards,* 441 F. 2d 749, 753 (5th Cir. 1971); *Lurie v. Oberhauser,* 431 F. 2d 330, 333 (9th Cir. 1970); *Gugliotta v. State,* 160 S.E.2d 266, 268 (Ga. Ct. App. 1968); *State v. Brown,* 341 N.E.2d 325, 326-327 (Ohio Ct. App. 1975).

We find it plain that the words of Duncan and Smith showed conclusively that they abandoned any right they possessed to object to a search of the automobile. Clearly by what they said they surrendered any expectation of privacy therein. They do not now challenge the legality of their arrest or the voluntariness of their statements. They do note in their brief: "The fact that the statements were made after the arrest is significant. Before arrest, the police are mere observers. After arrest, defendants can rightly consider the police as antagonists and act accordingly." Brief for appellants, note 4 at 9. We do not see the materiality of the significance in the circumstances. Surely police are not "merely observers" when they are pursuing a suspect or

when they are engaged in an investigation, and neither police pursuit nor the existence of an active police investigation centering on a suspect renders abandonment involuntary. *See United States v. Colbert, supra,* 474 F. 2d at 176; *United States v. Edwards, supra,* 441 F. 2d at 751-752. By the same token we do not think that the arrests of themselves compelled appellants to disclaim any knowledge of the automobile nor did they render the disclaimers involuntary. *See Abel v. United States, supra,* 362 U. S. at 221-225 and 239-241. The "abandonment" of the automobile was no more "compelled" by the arrests of Duncan and Smith than it would have been "compelled" by a hot pursuit of them. As we have seen, abandonment under hot pursuit has been consistently upheld.

Appellants assert: "[T]he question of 'abandonment' is a preliminary question involving standing," and suggest that we foreclosed the Court of Special Appeals from adjudicating any preliminary standing question when we remanded the case with the direction "to examine the proceedings to determine whether the search and seizure was proper." *Duncan and Smith v. State, supra,* 276 Md. at 732-733. They claim that "[t]here is no search and seizure when the police obtain possession of contraband after the defendant discards it," and they argue that our mandate did "not permit consideration of whether there was a search and seizure but only whether the search and seizure was proper." Brief for appellants at 7-8. It does not follow from the standing of appellants to object to the search and seizure that they must prevail on the merits. They may question whether they abandoned the automobile, but the answer is not preordained by the automatic standing bestowed by *Jones v. United States, supra.* The *Jones* rule of standing was not intended to prevent the State from showing voluntary pre-search abandonment or to apply to a possession prosecution when such abandonment is shown. *United States v. Colbert, supra,* 474 F. 2d at 177. Such abandonment by appellants was shown here and, therefore, the search and seizure was reasonable as to them.

We hold that the trial judge did not err in denying the motions to suppress the challenged evidence and that the Court of Special Appeals properly sustained the judgments of the Circuit Court for Frederick County.

> *Judgment affirmed; appellants to pay costs.*