Circuit Court for Prince George's County
Case No. CT170050X

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 257

September Term, 2017

_____

STATE OF MARYLAND

v.

DANIEL A. PAYNTER

_____

Eyler, Deborah S.
Beachley,
Moylan, Charles E., Jr.,
  (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Moylan, J.
_____

Filed: September 28, 2017

Circumstances frequently result in the police having to impound a citizen's automobile. For the mutual benefit of police and citizen alike, such impounding will routinely be accompanied by an inventorying of the contents of the automobile. This procedure is not necessarily a part of an adversarial "cops and robbers" scenario in a typical criminal investigation and trial. It may be, rather, what the Supreme Court has characterized as a "community caretaking function." Cady v. Dombrowski, 413 U.S. 433, 441, 93 S. Ct. 2523, 37 L. Ed. 2d 706 (1973):

> Local police officers . . . frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.

(Emphasis supplied).

Courts, therefore, must scrupulously forbear from reflexively looking upon this neutral police function with cynical disdain and must refrain from cavalierly dismissing such police behavior as presumptively a subterfuge. A modicum of trust would be more appropriate.

### The Present Case

The appellee, Daniel A. Paynter, was indicted in Prince George's County on January 12, 2017 for the possession of marijuana with the intent to distribute and related offenses. He moved to have the physical evidence suppressed because of an alleged violation of the Fourth Amendment. On March 24, 2017, the court granted the motion to suppress.

## The State's Interlocutory Appeal

The State filed a timely appeal on April 3, 2017. The appeal is authorized by Maryland Code, Courts and Judicial Proceedings Article, § 12-302(c)(4). Pertinent are subsections (c)(4)(iii) and (iv):

> (iii) Before taking the appeal, the State shall certify to the court that the appeal is not taken for purposes of delay and that the evidence excluded or the property required to be returned is substantial proof of a material fact in the proceeding. <u>The appeal shall be heard and the decision rendered within 120 days of the time that the record on appeal is filed in the appellate court</u>. Otherwise, the decision of the trial court shall be final.

> (iv) Except in a homicide case, if the State appeals on the basis of this paragraph, and if on final appeal the decision of the trial court is affirmed, the charges against the defendant shall be dismissed in the case from which the appeal was taken. In that case, the State may not prosecute the defendant on those specific charges or on any other related charges arising out of the same incident.

(Emphasis supplied).

The record was filed with this Court on June 8, 2017. Accordingly, our decision must be rendered no later than October 5, 2017. We heard oral argument on September 5, 2017.

## The Facts In A Nutshell

Other than being a routine traffic stop, the case against the appellee did not begin in any sense as a criminal investigation. On December 13, 2016, Officer Donald Rohsner was on routine traffic duty, using radar to look for speeding violations in the 800 block of Talbot Avenue in Laurel. He observed the appellee's white 2014 Chevrolet Impala traveling at "a speed of 50" in a clearly marked "30 mile per hour zone." He initiated a stop of the vehicle

2

and relayed the information about the car to "police dispatch." The appellee was the vehicle's driver and sole occupant.

Officer Rohsner ran the appellee's information through the Laurel Police Department's communication system and was informed that the appellee's driver's license was "suspended." When the officer further checked the registration status of the vehicle itself, he learned "that the tags were suspended through the Motor Vehicle Administration (M.V.A.) and that they were to be – there was a pick-up order on them, which means we must remove them and take them – put them into evidence so the vehicle did not have tags." During the stop, Officer Rohsner received a further dispatch that "said 10–0, possibly armed, which is a caution code that he was possibly armed." Based on that cautionary alert, "you would want to have a secondary officer for safety purposes."

Officer Nicholas Cahill responded to the traffic stop as that secondary officer. Officer Cahill, who also testified, confirmed that when the police encounter a "pick-up order," they "have to take the tags off the vehicle and we return them to the M.V.A." Officer Cahill went on to describe the written and established procedure of the Laurel Police Department with respect to inventories. He submitted the printed seven-page policy of the Department as State's Exhibit 1. He further testified that he had received "field training" on the proper implementation of the inventory procedure. He explained that the "purpose of an inventory search is to document all items in the vehicle, high value, anything you deem might be in the vehicle that needs to be inventoried." His direct examination pointed out:

3

Q. Okay. You indicated that [in] your inventory policy, you search for valuables.

A. Correct.

Q. What -- what constitutes a valuable item in your --

A. It could be a cell phone, hum, any debit cards, money left in the vehicle, clothing, tools.

Q. Okay. How do you acquire -- which items you encounter during an inventory search would require safekeeping?

A. We don't take anything for safekeeping. We will usually just leave that valuable in the vehicle. Hum, and it will stay in the vehicle while it's impounded.

There was no cross-examination.

Officer Cahill testified that he would routinely search the glove compartment, the central console area, and the trunk because that is where valuables would likely be found. Officer Cahill went on to explain that the general orders of the Laurel Police Department governing inventories require the use of a motor vehicle tow report form. A copy of that tow report was offered and admitted as State's Exhibit 2. On that form, the inventory in this case listed "a blue iPhone in the center console" and "seven Mac computers in the trunk of the car." In the course of making the inventory, the police also discovered and seized 51 grams of marijuana.

An overview of the suppression hearing is significant. The appellee did not testify and offered neither witnesses nor evidence on his motion to suppress. With respect to the two officers called by the State, the appellee asked not a single question by way of cross-examination.

4

The appellee's argument before the suppression hearing judge referred to Officer Rohsner's body camera which recorded his inventory searching. It showed three pairs of tennis shoes, a spare tire, a jack, and jumper cables that were not listed as part of the inventory. The appellee's argument was that the inventory was thereby flawed because it failed to include all items found in the car.[1] Logically implicit in such an argument is that such a subsequent failure to fill out the inventory listing with the requisite completeness would date back to invalidate the earlier discovery of the items to be inventoried. The search for the items, of course, was already <u>fait accompli</u> when the inventorying officer first puts pen to paper. In extremely summary terms, however, the trial judge's ruling bought the appellee's argument:

> What the video makes clear is that <u>what the police conducted is not an inventory, because an inventory lists everything</u> that is <u>and is not based on a subjective criteria as to what is quote valuable, unquote</u>. The motion to suppress is granted as to the contents of the trunk.

(Emphasis supplied). That is the sum total of the ruling. That is the ultimate constitutional ruling that we shall examine <u>de novo.</u>

---

[1] The footage taken by Officer Cahill's body camera of the inventory search was introduced by the State as State's Exhibit 3. Paradoxically, the appellee uses this footage as a part of the inventory. It is the only evidence there is of the "other items" that the appellee claims were not inventoried. If what is shown on the film is efficacious to support the appellee's appellate argument, as indeed it was to support the appellee's successful argument at the suppression hearing, then what prejudice has the appellee suffered? Would not the same film of the inventory search be equally efficacious to support a hypothetical claim of theft that the appellee might bring against the police department? Would it not thereby serve to support all of the community caretaking purposes that the inventory of the contents of the impounded vehicle was devised to serve? What then, if anything, is missing? If it looks like a duck and quacks like a duck . . . .

## The Supreme Court And Inventory Searches

To keep a proper sense of precedential proportion, we note that we are dealing, of course, with Fourth Amendment constitutional law. The Maryland opinions, which the appellee seems to argue almost exclusively, are but implementary and/or descriptive of that Fourth Amendment law. They are not themselves the core law to be applied. Whenever lawyers start cherry-picking phrases from random cases (as inevitably they must), it is always healthy to be able to go back to the original source instead of relying too heavily on subsequent glosses on that original source. It is always advisable to be cautious when using secondary sources. As a word is changed here or an emphasis is added there in making a gloss, and then a gloss upon a gloss, it is easy for the gloss to stray from the original message. If you want to know what South Dakota v. Opperman holds, therefore, read South Dakota v. Opperman.

For the law governing the inventorying by the police of the contents of an automobile about to be impounded, the original source is South Dakota v. Opperman, 428 U.S. 364, 96 S. Ct. 3092, 49 L. Ed. 2d 1000 (1976). It was and it remains the Fourth Amendment pole star. In Opperman, as here, the police determined that the vehicle in question would be towed to the impounding lot because of a violation of the traffic (parking) law. It had been illegally parked for a number of hours in a restricted zone. As in the present case, no crime other than the illegal parking itself was even suspected. The officer unlocked the car and, "using a standard inventory form pursuant to standard police procedures," inventoried the contents of the automobile, "including the contents of the

glove compartment which was unlocked." 428 U.S. at 366. In a plastic bag in the glove compartment, the police found and seized marijuana.

Opperman's motion to suppress the marijuana on the basis of a Fourth Amendment violation was denied and he was convicted of unlawful possession. The Supreme Court of South Dakota, however, reversed the conviction, holding that there had been a Fourth Amendment violation. On that issue, the Supreme Court of the United States then reversed the Supreme Court of South Dakota. The opinion of the United States Supreme Court indisputably placed the phenomenon of the inventory "search" in an essentially non-investigative context, referring to it expressly as a "caretaking procedure."

> When vehicles are impounded, local police departments generally follow a routine practice of securing and inventorying the automobiles' contents. These procedures developed in response to three distinct needs: the protection of the owner's property while it remains in police custody . . . ; the protection the police against claims or disputes over lost or stolen property . . . ; and the protection of the police from potential danger . . . . The practice has been viewed as essential to respond to incidents of theft or vandalism.
>
> . . . .
>
> These caretaking procedures have almost uniformly been upheld by the state courts, which by virtue of the localized nature of traffic regulation have had considerable occasion to deal with the issue. Applying the Fourth Amendment standard of "reasonableness," the state courts have overwhelmingly concluded that, even if an inventory is characterized as a "search," the intrusion is constitutionally permissible.

428 U.S. at 369–71 (emphasis supplied).

This larger philosophical overview of inventorying is important in this case because the appellee, in attempting to erect a procedural obstacle course, is trivializing the phenomenon. The appellee essentially begins with the notion that police credibility is

inherently suspect and that the officer must pass a series of procedural tests in order to prove his bona fides. South Dakota v. Opperman itself gives off no such emanations.

In holding that the inventory "search" in that case did not violate the Fourth Amendment, Opperman set out two basic requirements. The first is that the police must be lawfully entitled to impound or otherwise to exert custody over the vehicle.

> The Vermillion police were indisputably engaged in a caretaking search of a lawfully impounded automobile. . . . The inventory was conducted only after the car had been impounded for multiple parking violations.

428 U.S. at 375 (emphasis supplied).

The second requirement is that the inventorying must be conducted pursuant to "standard police procedure."

> [W]e conclude that in following standard police procedures, prevailing throughout the country and approved by the overwhelming majority of courts, the conduct of the police was not "unreasonable" under the Fourth Amendment.

428 U.S. at 376 (emphasis supplied).

In Illinois v. Lafayette, 462 U.S. 640, 103 S. Ct. 2605, 77 L. Ed. 2d 65 (1983), the inventory search before the Court was not of an automobile but of a shoulder bag carried by a defendant as he was arrested and subsequently brought into the station house. In inventorying the contents of the bag, the police discovered amphetamine pills inside a cigarette case. The most important message of the Lafayette opinion is that in carrying out the inventory process, the police are not required to find and to use the "least intrusive manner." Chief Justice Burger, writing for the Court, explained:

8

The Illinois court held that the search of respondent's shoulder bag was unreasonable because "preservation of the defendant's property and protection of police from claims of lost or stolen property, 'could have been achieved in a less intrusive manner.'["]

. . . .

Perhaps so, but the real question is not what "could have been achieved," but whether the Fourth Amendment requires such steps; it is not our function to write a manual on administering routine, neutral procedures of the stationhouse. Our role is to assure against violations of the Constitution.

The reasonableness of any particular governmental activity does not necessarily or invariably turn on the existence of alternative "less intrusive" means.

462 U.S. at 647 (emphasis supplied).

The Court admonished that this is a practical matter not calling for too demanding a case of perfection.

Even if less intrusive means existed of protecting some particular types of property, it would be unreasonable to expect police officers in the everyday course of business to make fine and subtle distinctions in deciding which containers or items may be searched and which must be sealed as a unit.

462 U.S. at 648 (emphasis supplied).

Eleven years after South Dakota v. Opperman, Colorado v. Bertine, 479 U.S. 367, 107 S. Ct. 738, 93 L. Ed. 2d 739 (1987), reaffirmed Opperman's basic attitude toward inventory searches. A Colorado police officer had arrested Bertine for driving his van under the influence of alcohol. Just before a tow truck arrived to take the van to an impounding lot, one of the officers, in accordance with local police procedure, inventoried the van's contents. The inventorying required opening a closed backpack which was found directly

9

behind the front seat of the van. The backpack contained a mare's nest of drugs and contraband.

> Inside the pack, the officer observed a nylon bag containing metal canisters. Opening the canisters, the officer discovered that they contained cocaine, methaqualone tablets, cocaine paraphernalia, and $700 in cash. In an outside zippered pouch of the backpack, he also found $210 in cash in a sealed envelope.

479 U.S. at 369.

Albeit noting that the inventory was performed in a "somewhat slipshod" manner, the trial court nonetheless ruled that the Fourth Amendment had not been violated. It nonetheless suppressed the evidence, ruling that the Colorado constitution had been violated, even if the United States Constitution had not been. The Supreme Court of Colorado affirmed the suppression, but on different grounds. It based its decision on its belief that the federal Fourth Amendment had been violated. In reversing the Colorado holding, the United States Supreme Court's opinion reaffirmed its earlier decision in Opperman.

> We found that inventory procedures serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger. In light of these strong governmental interests and the diminished expectation of privacy in an automobile, we upheld the search. In reaching this decision, we observed that our cases accorded deference to police caretaking procedures designed to secure and protect vehicles and their contents within police custody.

479 U.S. at 372 (emphasis supplied).

One reason the Colorado Supreme Court had found the inventory unconstitutional was because the police had not explored with Bertine the possibility of making other arrangements for the safekeeping of his property.

10

The Supreme Court of Colorado also expressed the view that <u>the search in this case was unreasonable because</u> Bertine's van was towed to a secure, lighted facility and because <u>Bertine himself could have been offered the opportunity to make other arrangements for the safekeeping of his property</u>.

479 U.S. at 373 (emphasis supplied). The appellee makes just such an argument in this case. Chief Justice Rehnquist's opinion to the contrary then emphasized:

> We conclude that here, as in <u>Lafayette</u>, <u>reasonable police regulations</u> relating to inventory procedures administered in good faith <u>satisfy the Fourth Amendment, even though courts might as a matter of hindsight be able to devise equally reasonable rules requiring a different procedure</u>.

479 U.S. at 374 (emphasis supplied).

The Supreme Court also rejected Bertine's argument that the inventory was fatally flawed because the police had been left with too much discretion.

> <u>Bertine finally argues that</u> the inventory search of his van was unconstitutional because <u>departmental regulations gave the police officers discretion to choose between impounding his van and parking and locking it in a public parking place</u>. The Supreme Court of Colorado did not rely on this argument in reaching its conclusion, and <u>we reject it</u>. <u>Nothing</u> in <u>Opperman</u> or <u>Lafayette</u> <u>prohibits the exercise of police discretion so long as that discretion is exercised according to standard criteria</u> and on the basis of something other than suspicion of evidence of criminal activity. Here, the discretion afforded the Boulder police was exercised in light of standardized criteria, related to the feasibility and appropriateness of parking and locking a vehicle rather than impounding it.

479 U.S. at 375–76 (emphasis supplied).

In <u>Colorado v. Bertine</u>, 479 U.S. at 376, the concurring opinion of Justice Blackmun, joined by Justice Powell and Justice O'Connor, stressed the importance of conducting an inventory "only pursuant to standardized police procedures."

11

> I join the Court's opinion, but write separately to underscore <u>the importance of having such inventories conducted only pursuant to standardized police procedures</u>.

479 U.S. at 376 (emphasis supplied).

In <u>Florida v. Wells</u>, 495 U.S. 1, 110 S. Ct. 1632, 109 L. Ed. 2d 1 (1990), the defendant was stopped by the Florida Highway Patrol for speeding and was then arrested for driving under the influence of alcohol. His car was impounded. The preliminary inventory search turned up two marijuana cigarette butts in an ashtray and a locked suitcase in the trunk. The suitcase was forced open and was found to contain a garbage bag containing a considerable amount of marijuana. The Florida Court of Appeals and then the Supreme Court of Florida held that the opening of the locked suitcase, in the total absence of any standardized policy controlling such a search, was a violation of the Fourth Amendment. The United States Supreme Court agreed and affirmed.

Speaking through Chief Justice Rehnquist, the Supreme Court held that the violation occurred when, in the course of an otherwise proper inventory, the police opened a locked suitcase <u>in the total absence of any policy with respect to closed containers</u>.

> [T]he Florida Highway Patrol had no policy whatever with respect to the opening of closed containers encountered during an inventory search. We hold that <u>absent such a policy, the instant search was not sufficiently regulated to satisfy the Fourth Amendment</u> and that the marijuana which was found in the suitcase, therefore, was properly suppressed by the Supreme Court of Florida.

495 U.S. at 4–5 (emphasis supplied).

The holding was not that the controlling policy must contain one of the binary commands that all locked containers may always be searched or that no locked containers

12

may ever be searched. There must be an express policy, however, and some guidelines must be provided to constrain police discrimination.

> A police officer may be allowed sufficient latitude to determine whether a particular container should or should not be opened in light of the nature of the search and characteristics of the container itself. Thus, while policies of opening all containers or of opening no containers are unquestionably permissible, it would be equally permissible, for example, to allow the opening of closed containers whose contents officers determine they are unable to ascertain from examining the containers' exteriors. The allowance of the exercise of judgment based on concerns related to the purposes of an inventory search does not violate the Fourth Amendment.

495 U.S. at 4 (emphasis supplied).

## Where Are We Analytically?

The recurring theme of the Supreme Court, from South Dakota v. Opperman through Florida v. Wells, is that an inventory search is normally a non-investigatory community caretaking function. How, then, does such non-investigatory behavior fit into our more familiar framework of Fourth Amendment analysis? In terms of constitutional algebra, something discovered in the inventory search may trigger the Plain View Doctrine. Analytically, the initial non-investigatory inventory search would qualify as a prior valid intrusion, a critical element of the Plain View Doctrine. When evidence is then spotted in plain view, with the requisite probable cause to believe that it is evidence, a Plain View Doctrine warrantless seizure is quintessentially reasonable. Coolidge v. New Hampshire, 403 U.S. 443, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971); Arizona v. Hicks, 480 U.S. 321, 107 S. Ct. 1149, 94 L. Ed. 2d 347 (1987).

From the very beginning of this period of constitutional development, on the other hand, the recurring and persistent theme of the dissenting voices has been the fear that the

police will use the ostensibly non-investigatory search as a subterfuge to make investigatory searches that would otherwise be forbidden. The critical question, therefore, becomes that of "Whether the prior intrusion that leads to the plain view of the evidence is, in truth, a prior **VALID** intrusion?" For the criminal defendant, the instinctive response is to cry "Subterfuge!" The tactical consequences of that instinct have been to come up with as many attacks as possible on the integrity of the inventory. For inventory searches generally, we are called upon to determine whether the ostensibly prior valid intrusion was, indeed, **VALID**.

In terms of careful and precise analysis, moreover, footnote 6 of the Opperman opinion, 428 U.S. at 370 n.6, also raises an interesting question with respect to the constitutional algebra. It carefully points out that an inventory "search," in terms of analytic clarity, may not be a "search" within the contemplation of the Fourth Amendment at all. It may not be analytically precise, therefore, to call the inventory an exception to or an exemption from the warrant requirement, because the entire warrant requirement (along with all of its exceptions) relates to criminal investigations and depends upon probable cause. The true inventory, by contrast, has nothing to do with either. It is probably more analytically correct, therefore, to think of the inventory as an instance of the "Fourth Amendment Inapplicable" rather than as an instance of the "Fourth Amendment Satisfied." In Opperman, however, the petitioner did not pursue this line of reasoning and the Supreme Court was not required to pursue the matter further. The very insightful footnote, however, reads in its entirety:

14

Given the benign noncriminal context of the intrusion, see <u>Wyman v. James</u>, 400 U.S. 309, 317, 91 S. Ct. 381, 385, 27 L. Ed. 2d 408 (1971), <u>some courts have concluded that an inventory does not constitute a search for Fourth Amendment purposes.</u> See e. g., <u>People v. Sullivan</u>, <u>supra</u>, 29 N.Y.2d, at 77, 323 N.Y.S.2d, at 952, 272 N.E.2d, at 469; <u>People v. Willis</u>, 46 Mich. App. 436, 208 N.W.2d 204 (1973); <u>State v. Wallen</u>, 185 Neb. 44, 49-50, 173 N.W.2d 372, 376, cert. denied, 399 U.S. 912, 90 S. Ct. 2211, 26 L. Ed. 2d 568 (1970). <u>Other courts have expressed doubts as to whether the intrusion is classifiable as a search.</u> State v. All, 17 N.C. App. 284, 286, 193 S.E.2d 770, 772, cert. denied, 414 U.S. 866, 94 S. Ct. 51, 38 L. Ed. 2d 85 (1973). <u>Petitioner, however, has expressly abandoned the contention</u> that the inventory in this case is exempt from the Fourth Amendment standard of reasonableness.

(Emphasis supplied).

## The Maryland Reception

Six months after <u>South Dakota v. Opperman</u> was decided, this Court recognized it and applied it in <u>Duncan and Smith v. State</u>, 34 Md. App. 267, 366 A.2d 1058 (1976). We affirmed the denial of the defendant's suppression motions on two grounds: 1) that the inventory search of an automobile was proper, and 2) that the defendants had abandoned the automobile in question. In affirming the decision of this Court in <u>Duncan and Smith v. State</u>, 281 Md. 247, 378 A.2d 1108 (1977), the Court of Appeals did not agree with our decision that, on the facts of the case, the decision to inventory had been made in good faith, but it did agree that the defendants had abandoned the automobile and, therefore had no standing to object. The opinion of Judge Orth, however, fully accepted the new Supreme Court law.

Despite the narrowness of the <u>Opperman</u> holding, necessarily restricted to the facts of that case, <u>there emerges from the Court's opinion a doctrine</u>, viable even though not fully developed, <u>which permits</u> as reasonable by Fourth Amendment standards, <u>the inventory search of an automobile under certain conditions</u>.

15

281 Md. at 258–59 (emphasis supplied). From the beginning, Maryland recognized that the two key requirements of that new doctrine are 1) that the vehicle be lawfully in police custody and 2) that the inventory be done "pursuant to standard police procedure."

> We find the present stage of the doctrine to be that <u>the police may</u>, without regard to probable cause, and, thus, absent a warrant, <u>constitutionally enter an automobile and unlocked compartments therein, and inventory and seize articles found, provided</u> the <u>vehicle had been</u> otherwise <u>legally taken into police custody and</u> the <u>inventorying was pursuant to a standard police procedure</u>.

281 Md. at 259 (emphasis supplied).

More recent decades have seen the appearance of three prominent Maryland appellate opinions on the subject of inventory searches: <u>Briscoe v. State</u>, 422 Md. 384, 30 A.3d 870 (2011), from the Court of Appeals and both <u>Sellman v. State</u>, 152 Md. App. 1, 828 A.2d 803 (2003), and <u>Thompson v. State</u>, 192 Md. App. 653, 995 A.2d 1030 (2010), from this Court. In two of those cases, the police ran afoul of the qualifying requirement so heavily stressed by the Supreme Court in <u>Florida v. Wells</u>, to wit, that the inventory search be carried out pursuant to standardized policy.

In <u>Briscoe</u>, a minivan was initially stopped because its taillight was not illuminated. Briscoe, the driver, could not produce a driver's license. A radio check revealed that his driver's license had been suspended and that there was, moreover, an open warrant for his arrest. Accordingly, the police decided to have the minivan towed to the "City yard." An inventory search of the minivan's contents revealed a handgun in the glove compartment as well as several vials of cocaine near the steering wheel and in the center console.

Significantly, however, the police produced no evidence with respect to a standardized

Police Department policy or procedure on the subject of inventorying.

> Neither did the State introduce any evidence of a Baltimore City Police Department policy or procedure regarding inventory searches.

422 Md. at 393.

Judge (later Chief Judge) Barbera's opinion for the Court of Appeals began its

analysis by stressing again the two key requirements of a constitutional inventory.

> Pursuant to this well-defined exception to the warrant requirement, <u>a search of a vehicle for the purpose of itemizing the property therein is constitutional, so long as the vehicle is in lawful police custody</u> at the time of the search <u>and the search is carried out pursuant to "standardized criteria or [an] established routine"</u> established by the law enforcement agency.

422 Md. at 397 (emphasis supplied).

Judge Barbera's opinion pointed to the Supreme Court's unequivocal message in

Florida v. Wells:

> The Court agreed with Wells that <u>the search</u> of the locked suitcase <u>could not be upheld as an inventory search, because "the record contained no evidence of any Highway Patrol policy</u> on the opening of closed containers found during inventory searches."
>
> . . . .
>
> Consequently, the Court held that <u>the search "was not sufficiently regulated to satisfy the Fourth Amendment[.]"</u>

422 Md. at 399 (emphasis supplied).

In the absence of any evidence whatsoever of a standardized police policy, the

inventory search in <u>Briscoe</u> could not pass Fourth Amendment muster.

> The case at bar suffers from <u>the same lack of evidence</u> in the record <u>of a Baltimore City Police Department policy</u> concerning the opening of

17

locked containers during an inventory search. <u>In the absence of evidence that such a policy existed, it is impossible to distinguish a valid inventory search from a general investigatory search.</u>

<u>Id</u>. (emphasis supplied).

Precisely the same flaw had invalidated an earlier inventory search in <u>Sellman v. State</u>. The defendant there had had his "hatchback" vehicle stopped on a highway "with blue front signal lights and a cracked windshield, both in violation of the Maryland Transportation Code." 152 Md. App. at 6. Sellman was the driver and sole occupant. He acknowledged to the traffic officer that his driver's license had been suspended. He could not produce a registration card. A records check showed that the license had been suspended in 1992, revoked in 1993, and that it remained revoked. The officer also learned that there was a "pickup order" for the car and, as in the present case, an order to secure the tags.

The officer arrested Sellman and called for a tow truck. An inventory search of the vehicle revealed a red nylon bag in the hatchback area containing a handgun and a glassine bag containing 24.34 grams of marijuana. The trial court denied the motion to suppress the physical evidence. Defense counsel acknowledged that there was justification for an inventory but pointed out that the State had failed to show any "general administrative procedure in that regard." Judge Deborah Eyler's opinion for the Court of Special Appeals thoroughly reviewed <u>South Dakota v. Opperman</u>, <u>Illinois v. Lafayette</u>, <u>Colorado v. Bertine</u>, and <u>Florida v. Wells</u>. Her opinion stressed the necessity for evidence of a standard established police policy and the fatal lack of it in the <u>Sellman</u> case itself.

18

> The Supreme Court cases make clear that to ensure that ulterior investigatory motives are not at play <u>an inventory search must</u> at a bare minimum <u>be a search</u> of lawfully detained property <u>carried out</u> by a police officer <u>in accordance with standard policies established by the officer's law enforcement agency. Without the existence of a standard policy, an officer's actions</u> in conducting the search <u>are not sufficiently regulated to assure that the search is in furtherance of legitimate police caretaking functions,</u> unrelated to the existence <u>vel non</u> of probable cause, <u>and not in furtherance of the officer's own investigatory motives.</u>
>
> <u>In the case at bar, the State did not present any evidence of the existence of a standard inventory search policy.</u>

152 Md. App. at 21 (emphasis supplied).

There not only must be such a policy. There must also be evidence of such a policy presented to the suppression hearing judge. Judge Eyler stressed the indispensability of such evidence.

> While in argument the prosecutor made reference to Anne Arundel County's having a policy that all vehicles subject to being towed are to be searched, and <u>while such a policy may exist (and may even have been known by the trial judge to exist), we must base our decision on the evidence actually presented at trial. There was no evidence of any standardized policy</u>, rule, or regulation of any sort governing inventory searches by Anne Arundel County police officers; and <u>there was no evidence that Officer Novotny carried out his search in accordance with any such policy</u>.

152 Md. App. at 21–22 (emphasis supplied).

The mere absence of subterfuge is not enough. There must still be affirmative evidence of a policy.

> We agree with the State that the <u>facts in evidence do not point in the direction of a pretextual search.</u> Nevertheless, as we have explained, the Supreme Court case law requires that, <u>for a search to in fact be a valid inventory search in the eyes of Fourth Amendment law, there must be proof that the search was carried out pursuant to an existing policy</u> regulating police inventory searches. <u>That evidence is essential to establishing the inventory search exception</u>, regardless of whether the total circumstances

19

seem more consistent with the search's having been performed for a community caretaking purpose than for an investigatory purpose.

152 Md. App. at 23 (emphasis supplied).

Judge Wright's opinion for this Court in Thompson v. State strongly supports the State's position. At approximately three o'clock in the morning, a Baltimore County police officer noticed a green Lexus in the area of Route 40 and Frederick Road and decided to run a records check on the vehicle's license tag. When the M.V.A. indicated that it could not find a registration for the vehicle, Officer Brown stopped the vehicle. The appellant, Jeffrey Thompson, was unable to produce a driver's license or other state identification. Thompson attempted to produce various insurance documents to prove that the car was properly registered, but the documents referred, counterproductively, to not one, but three different vehicle identification numbers (VINs). Officer Brown testified that that led him to suspect some sort of fraud.

The officer arrested Thompson for "failure to provide sufficient identification." Officer Brown also called a towing company to impound the vehicle. In the course of a routine inventory search, the officer recovered a nine millimeter pistol in a book bag in the trunk of the car. Before this Court, Thompson argued that his arrest was unlawful and that the gun produced in the search that followed was the fruit of the poisonous tree.

The opinion of this Court acknowledged that the arrest issue was a very close question but that it was unnecessary to decide it because of the State's alternative theory of the case.

> Alternatively, the State suggests that the recovery of the handgun occurred during a lawful inventory search. We agree with the State's latter rationale

and will affirm the motion court's ruling <u>because it is clear that the vehicle had to be impounded regardless of whether there was probable cause to arrest appellant in this case.</u>

192 Md. App. at 666 (emphasis supplied).

Judge Wright's opinion explained that even if, <u>arguendo</u>, the arrest had been illegal, the unregistered car would have to have been impounded in any event and the attendant inventory would inevitably have led to the discovery of the gun.

> [E]ven if appellant's arrest was illegal, <u>the removal of the unregistered vehicle from the custody of an unlicensed driver was not illegal</u>, and <u>the handgun would have inevitably been discovered during the subsequent lawful inventory search of the vehicle.</u>

192 Md. App. at 669 (emphasis supplied).

The impounding of the vehicle, moreover, was perfectly proper.

> From this, we conclude that <u>it was reasonable for the police to seize the vehicle that appellant was driving based on the totality of the circumstances, including the lack of proper registration, the conflicting VINs, appellant's failure to provide license information</u> on demand, and the fact that appellant's passenger was no longer on the scene and available to drive the vehicle. Further, this record establishes that <u>the inventory was performed in accordance with standardized written procedures</u> of the Baltimore County Police Department. <u>The handgun</u>, as well as appellant's identification, located together in a book bag in the trunk of the vehicle, <u>were properly recovered during an inventory search</u>.

192 Md. App. at 672–73 (emphasis supplied).

Even had Thompson's arrest been unlawful, the inevitable discovery exemption from the fruit of the poisonous tree doctrine would have precluded the suppression of the gun found in the inventory search of a properly impounded vehicle.

> [R]egardless of whether appellant was lawfully arrested, <u>the handgun would have inevitably been discovered by a later inventory search pursuant to standardized police procedures</u>. The motion was properly denied.

21

192 Md. App. at 673 (emphasis supplied).

**Lawful Police Custody Of The Vehicle**

Of the two cardinal requirements for a valid inventory search that have been consistently stressed by the four salient Supreme Court opinions and by the appellate caselaw of Maryland alike, the first is that the vehicle to be inventoried must be in the lawful custody of the police. In this case, that fact was indisputably established.

The stopping officer was on standard highway patrol duty, manning the radar from a fixed position, when he stopped the appellee for doing 50 miles per hour in a 30 mile per hour zone. The appellee was the only occupant of the car. A radio check revealed that the appellee's driver's license had been suspended. The appellee himself, therefore, would not have been allowed to drive the car away. In checking the registration status of the vehicle, the officer further learned that the Motor Vehicle Administration had suspended the tags and that there was a pick-up order for them. As a back-up officer testified, when the officers encounter a "pick-up order," they have to "take the tags off the vehicle and we return them to the M.V.A." In this case, no one, therefore, would have been allowed to drive that "untagged" automobile away from the 800 block of Talbot Avenue in Laurel.

The appellee does not even argue that his vehicle was not in lawful police custody. The suppression hearing court made no finding that the car was not in lawful police custody. We hold that this key requirement was incontestably satisfied.

The appellee nevertheless argues that the police were not authorized to tow the car because they did not exhaust all alternatives to towing. The caselaw makes clear, however,

that such an exhaustion of alternatives is not required. In <u>United States v. Williams</u>, 777

F.3d 1013 (8th Cir. 2015), the argument mirrored the one the appellee mounts in this case.

In refuting it, the United States Court of Appeals for the Eighth Circuit had no difficulty in

holding:

> [H]e argues that Officer Loftis's original decision to impound his vehicle, which then led to the search, <u>was unlawful.</u>
>
> <u>The Tow Policy leaves it up to an officer's discretion whether to tow a vehicle after an arrest. "The Fourth Amendment permits exercise of such discretion</u> . . . 'so long as that discretion is exercised according to standard criteria . . . other than suspicion of evidence of criminal activity.'" . . . These standardized criteria, however, do not need to be part of the written policy itself, so long as "the officer's residual judgment is exercised based on legitimate concerns related to the purposes of an impoundment." . . . "<u>[A]n impoundment policy may allow some latitude and exercise of judgment by a police officer . . . .</u>"

777 F.3d at 1016 (emphasis supplied).

The appellee here also specifically claims that the car's lawful owner, his mother,

should have been notified and given a voice in deciding how to get the car off of Talbot

Avenue. Precisely that argument was made to the 8th Circuit in <u>United States v. Arrocha</u>,

713 F.3d 1159 (8th Cir. 2013). The Eighth Circuit held:

> "Nothing in the Fourth Amendment requires a police department to allow an arrested person to arrange for another person to pick up his car to avoid impoundment and inventory."

713 F.3d at 1164.

## Standardized Police Policy

The second of the cardinal requirements for a valid inventory search is that such a

search must be carried out pursuant to a standardized police policy. In this case, that

requirement was abundantly satisfied. The Laurel Police Department has a seven-page General Order, issued on May 6, 2014, dealing with "Motor Vehicle Impounding." Sect. 4/308.20 D. Impound and Release Procedure b. provides:

> The contents of all impounded vehicles shall be inventoried and listed on a Motor Vehicle Tow Report.

That entire General Order was introduced at the suppression hearing as State's Exhibit 1. The Tow Report that, <u>inter alia</u>, listed the items recorded pursuant to the inventory, was also introduced at the suppression hearing as State's Exhibit 2. In addition to the documentary evidence, Officer Cahill testified about his department's inventory policy, about his familiarity with it, and about his "field training" with respect to the proper implementation of the inventory procedure.

At the suppression hearing, defense counsel did not argue that the police did not have an inventory policy. Defense counsel does not now contend that the General Order was inadequate in any way. We hold that this policy requirement was abundantly satisfied.

## Of Spare Tires, Jacks, And Oily Rags

With the appellee's acknowledgement that the two key requirements for a constitutional inventory search have been satisfied, what back-up contentions remain to give us pause? As the appellee nips away at the heels of this inventory search, he raises several protests about the manner in which the inventory was executed. The legal theory he advances seems to be that even if an inventory search is initially justified, any imperfection in the later execution of the listing process may date back and invalidate the earlier search.

24

The appellee's major subcontention in this regard concerns the making of the inventory list. The tow report that was State's Exhibit 2 listed the significant or valuable contents of the appellee's car as "a blue iPhone in the center console" and "seven Mac computers in the trunk of the car." A body camera, worn by Officer Cahill as he made the inventory search, also shows that, albeit unlisted, there were also in the trunk a spare tire, a jack, jumper cables, and three pairs of tennis shoes.

It is the appellee's argument that the inventory list is, therefore, fatally incomplete and that this imperfection in the listing should date back and, as a matter of law, invalidate the inventory search that preceded it. This clearly seems to have been the rationale accepted by the suppression hearing judge in ruling that the inventory search was unconstitutional. As the judge ruled, "[W]hat the police conducted is not an inventory, because an inventory lists everything." None of the Supreme Court opinions or the major Maryland opinions on the subject, however, has remotely alluded to any such an invalidating principle, and we are not, as a matter of first impression, about to proclaim such a proposition here.

There would be all sorts of problems with such a rule. Both the appellee and the suppression hearing judge seem to have conflated the inventory searching, on the one hand, and the inventory listing, on the other hand, into a single indivisible and contemporaneous act. They are, however, two acts, separate and sequential. The inventory searching is already a fait accompli when the inventory listing commences. When contraband or other evidence of crime is revealed in the course of the inventory search, the Plain View Doctrine is complete within the blink of the officer's eye. A later event, the making of the list, will not retroactively date back and make the prior valid intrusion invalid. For the appellee and

25

the suppression hearing judge to have ignored this sequence was, at least in microcosm, to rewrite history. It does not logically follow.

On the other hand, even if some later imperfection in the making of the inventory list will not, as a matter of law, automatically invalidate what preceded the imperfection, it may, as an alternative theory of relevance, at least be evidence that the searching officer was insincere in his earlier protestations of non-investigative purpose in conducting the search. Subsequent events may, after all, throw light on earlier motivation. At the suppression hearing, of course, there was neither argument nor discussion about such a theory and there was no finding of fact by the judge in that regard. Maybe the officer who is more obsessive about making an exhaustive list will be less likely to have been insincere about his searching motives. Or maybe just the opposite is true.

In this case, however, we do not see any imperfection in the inventory list. The Fourth Amendment's key criterion is the adjective "reasonable." Without any elaborate exegesis, "reasonable" refers to practical decisions as a matter of common sense. As a matter of common sense, we know instinctively that South Dakota v. Opperman never contemplated that the police should inventory four wheels, four hubcaps, six or eight spark plugs, an aerial, and ten gallons of gas. They, to be sure, are essentially part of the automobile rather than contents of the automobile. Ordinarily, however, even a spare tire may be bolted down in its secure niche so as to be part of the automobile. Instinctively, we also know that other items closely associated with the operation of the automobile, such as a jack or jumper cables are in the same category, whether bolted down or not. In the present case, this leaves us with some unlisted tennis shoes. Curiously, the appellee, with full

26

opportunity to do so, never asked Officer Cahill why he did not list the tennis shoes. This complaint is clearly an appellate afterthought. As our de novo independent constitutional determination, we are not about to say that Officer Cahill was guilty of subterfuge because he did not list the tennis shoes. Such a holding would trivialize the Fourth Amendment.

In United States v. Lopez, 547 F.3d 364 (2d Cir. 2008), the United States Court of Appeals for the Second Circuit threw some interesting light on whether an inventory list must include all items found in a car or only those items that the inventorying officer deems to be valuable items. The Second Circuit posed the issue:

> Barrett testified that it was proper procedure to list all items found in an impounded vehicle. Officer Arroyo said it was her practice to list only items of value, grouping others under a general catch-all. Arroyo added, "Some cops don't make any list at all, some cops may list everything. It is not written anywhere that we have to make any type of a list." Because the search conducted in his case under Officer Arroyo's direction did not result in a complete list of the contents of the car, Lopez argues further that the search necessarily failed to meet the requirement that the objective of the search must be to produce an inventory.

547 F.3d at 370 (emphasis supplied).

The Second Circuit explained that the completeness of an inventory list does not go to the core purpose or protection of the inventory search law.

> The lack of standardization that serves as the basis of Lopez's argument concerns whether the inventory list produced must include an itemization of every object found in the car, or whether items of small value may be omitted or grouped under a general category. We do not understand the Supreme Court's requirement of a standardized policy to extend to this issue because it has no bearing on the reason for the requirement of standardization. A standardized policy is needed to ensure that inventory searches do not become "a ruse for a general rummaging in order to discover incriminating evidence." . . . While the Supreme Court referred to the need for a standardized policy, we do not think the Court meant that every detail of search procedure must be governed by a standardized policy.

27

547 F.3d at 370–71 (emphasis supplied). No purpose would be served by listing items of insignificant value.

> Nor do we think the Court intended to require uniformity as to whether insignificant items of little or no value must be explicitly itemized. Once again, departmental uniformity on that issue would have no bearing on protecting the privacy interests of the public from unreasonable police intrusion.

547 F.3d at 371 (emphasis supplied).

The Lopez opinion reasoned that too pressing a demand on the process of inventory listing would actually be detrimental to important government interests.

> The concept of an inventory does not demand the separate itemization of every single object. A conventional family automobile is likely to contain a bunch of road maps, pens and a notepad, a bottle opener, packs of chewing gum or candy, clip-on sunshades, a pack of tissues, a vanilla-scented deodorizer, DVDs and children's games, a baby bottle and a soiled baby blanket, an old sock, a sweater, windshield cleaning fluid, jumper cables, a tow rope, a tire iron and jack, a first aid kit, and emergency flares, not to mention empty candy wrappers and wads of chewed gum. That an officer might use a catch-all to cover objects of little or no value in no way casts doubt on the officer's claim that the purpose of the search was to make an inventory. It would serve no useful purpose to require separate itemization of each object found, regardless of its value, as a precondition to accepting a search as an inventory search. Such an obligation would furthermore interfere severely with the enforcement of the criminal laws by requiring irrational, unjustified suppression of evidence of crime where officers, conducting a bona fide search of an impounded vehicle, found evidence of serious crime but, in making their inventory, failed to distinguish between the maps of Connecticut and New York, or failed to list separately the soiled baby blanket or a pack of gum. Imposing a requirement to identify each item separately, regardless of lack of value, would furthermore add considerable administrative burden without in any way advancing the purposes of the Fourth Amendment to protect the public from "unreasonable searches and seizures."

547 F.3d at 371–72 (emphasis supplied).

28

More generally speaking, there is no charter for the idea that an imperfection in executing an inventory search will, ipso facto, invalidate the entire procedure. In Colorado v. Bertine itself, though the suppression hearing judge found as a matter of fact that "the inventory of the vehicle was performed in a 'somewhat slipshod' manner," 479 U.S. at 369, the Supreme Court did not hesitate to hold that the inventory was ultimately reasonable. It did not even need to examine further the "slipshod manner" of the inventory's execution. As Colorado v. Bertine made perspicaciously clear, substantial compliance does not require vying for the Olympic Gold in inventory listing. See also United States v. Williams, supra; United States v. Loaiza-Marin, 832 F.2d 867, 869 (5th Cir. 1987) ("[T]he agent's failure to complete the inventory forms does not mean that the search was not [a valid] inventory search."); United States v. Trullo, 790 F.2d 205, 206 (1st Cir. 1986) (declining to "hold that the officer's failure, technically, to follow the inventory form procedures for valuables meant it was not an inventory search."); Commonwealth v. Torres, 85 Mass. App. Ct. 51, 53–54, 5 N.E.3d 564, 566 (2014) ("Where the police fell short was in documenting the search that had already been conducted. We agree with the Commonwealth that this sort of after-the-fact documentation error does not by itself invalidate an otherwise valid search."); Commonwealth v. Baptiste, 65 Mass. App. Ct. 511, 518, 841 N.E.2d 734, 739 (2006) ("[A]ny defect in the vehicle inventory report or the prisoner property inventory would not invalidate the inventory search."). In his insistence on exhaustive listing as a necessary badge of police integrity, the appellee stands alone. He cites neither caselaw nor academic authority to support his position.

**A Mixed Motive Is Not A Fatal Flaw**

29

The appellee emits one last gasp. During Officer Rohsner's communication with the Police Dispatch unit, the officer received a "10–0" from dispatch, informing him that the driver he was detaining might be armed. From this lone and unilluminated fact, the appellee, on appeal, leaps to the immediate conclusion that from that moment on, the police motive was necessarily and automatically the investigative motive of gathering evidence of crime. The appellee contends:

> It is evident that the decision to search the car arose not from genuine need to impound the car and a desire to safeguard the items therein, but rather from a desire to look for incriminating evidence. Even if the officers had followed the standardized procedure contained in the General Order in impounding and searching the car—which they did not—their blatantly investigatory motive for conducting the search would render it invalid.

(Emphasis supplied). That is conspiracy theory run rampant.

We are not so quick to read the minds of the officers. Their psyches are not so one-dimensional. The appellee's rationale seems to be that the fact that the appellee might have been armed necessarily tags the appellee as a criminal type and that, when dealing with a criminal type, the officers will automatically conduct a search with an investigative purpose to the exclusion of a community care-taking purpose.

The caselaw, however, does not agree with appellee's facile conclusion that an investigative purpose necessarily animates the search of anyone who may be involved with criminal behavior. In Illinois v. Lafayette, for instance, the police were well aware that Lafayette had already been arrested for disturbing the peace and was actually in handcuffs when they conducted what was nonetheless held to have been a valid inventory search.

In both <u>Colorado v. Bertine</u> and <u>Florida v. Wells</u>, the defendants had been arrested for driving under the influence of alcohol before any inventory was conducted. In <u>Colorado v. Bertine</u>, the inventory was upheld as a valid one. In <u>Florida v. Wells</u>, the inventory was examined as a possibly valid one but was ultimately struck down only because of the absence of a standardized police procedure. A possible connection to crime on the part of the suspect did not lead to the presumption that the police motive in conducting an ostensible inventory would necessarily be an investigative one.

In <u>Sellman v. State</u>, Sellman himself was arrested for driving on a revoked license. In <u>Briscoe v. State</u>, Briscoe was similarly arrested for driving on a suspended license. There was, moreover, an open arrest warrant out for him. In each case, however, it was tentatively accepted that the inventory search had been conducted for a proper non-investigative purpose. In each case, the inventory search itself was accepted as being a proper one and the reason for the ultimate reversals was exclusively because of the lack of evidence of any standardized police policy. The appellee's easy presumption as to police motivation, therefore, does not automatically follow. We note again, moreover, that the appellee had a full opportunity in this case to cross-examine both officers about the cautionary alarm that they had received and about their reaction to it. Not one question, however, was asked. In argument at the close of the suppression hearing, the brief reference to the issue by defense counsel was glibly conclusory.

> Your Honor, I would submit that <u>the minute that they heard that he was suspected of being in possession of a weapon this became a purely disguised search for evidence</u> in rummaging through the car.

(Emphasis supplied). That is lightning psychoanalysis.

31

Indeed, as <u>Horton v. California</u>, 496 U.S. 128, 110 S. Ct. 2301, 110 L. Ed. 2d 112 (1990), solidly established, a reasonable warrantless seizure of evidence pursuant to the Plain View Doctrine does not require the spotting of the probable evidence in plain view to have been inadvertent.

Even when the police realistically possess some expectation of finding evidence of crime, that does not represent some virulent taint that <u>ipso facto</u> contaminates the parallel inventory purpose of the search. Even though neither the Supreme Court nor the Maryland courts have had the occasion to examine the subject, the national caselaw is clear that the two purposes may comfortably co-exist. They are not mutually antagonistic.

Once again, the United States Court of Appeals for the Second Circuit has provided solid guidance in <u>United States v. Lopez</u>, <u>supra</u>. The two purposes are by no means incompatible.

> <u>Lopez argues</u> that in his case <u>the procedures were not administered in good faith because the officers were motivated by the expectation of finding criminal evidence</u> in his car. We believe this also misunderstands the Court's explanations. The Fourth Amendment does not permit police officers to disguise warrantless, investigative searches as inventory searches. . . . However, <u>the Supreme Court has not required an absence of expectation of finding criminal evidence as a prerequisite to a lawful inventory search.</u> When officers, following standardized inventory procedures, seize, impound, and search a car <u>in circumstances that suggest a probability of discovering criminal evidence, the officers will inevitably be motivated in part by criminal investigative objectives. Such motivation,</u> however, <u>cannot reasonably disqualify an inventory search that is performed under standardized procedures for legitimate custodial purposes.</u>

547 F.3d at 372 (emphasis supplied).

As long as the established conditions for executing an inventory search are satisfied, the addition of an investigative expectation does not invalidate that parallel justification.

> Under the Supreme Court's precedents, <u>if a search</u> of an impounded car for inventory purposes <u>is conducted under standardized procedures, that search falls under the inventory exception</u> to the warrant requirement of the Fourth Amendment, <u>notwithstanding a police expectation that the search will reveal criminal evidence.</u> If good faith is a prerequisite of an inventory search, <u>the expectation and motivation to find criminal evidence do not constitute bad faith.</u>

547 F.3d at 372 (emphasis supplied).

In the present case, the appellee's flawed interpretation of the law would hold that even if the police originally had a good-faith reason to inventory the appellee's car, their receipt of the alarm that appellee was possibly armed would, like some poisonous venom, immediately transmute the good faith into bad faith. It will not. It did not in <u>Lopez</u>.

> In the present case, <u>while the officers may well have had an investigative motivation to search Lopez's car, the circumstances called for the impoundment of his car</u>, as Lopez was arrested for driving it while intoxicated, and the impoundment required the conduct of an inventory search. We find no reason to doubt that <u>the Supreme Court's standards for the conduct of a warrantless inventory search were fully satisfied.</u>

<u>Id</u>. (emphasis supplied).

The evidence suggesting that the police, before inventorying the contents of an automobile, could plausibly have had an investigatory motive was far stronger in <u>United States v. Mundy</u>, 621 F.3d 283 (3d Cir. 2010), than in the present case. The Court of Appeals for the Third Circuit nonetheless held the inventory there to have been valid.

> [B]oth <u>Officers Chabot and Soto testified that they detected a strong odor</u> in the vehicle, <u>which they identified as cocaine</u> based on anecdotal evidence, including its distinctive scent. . . . <u>Such initial observations alone do not suggest that the subsequent inventory search was conducted in bad faith.</u>

33

621 F.3d at 294 (emphasis supplied).

The rationale for the defendant's attack on an inventory search in <u>Armstrong v. State</u>, 325 Ga. App. 690, 754 S.E.2d 652 (2014), parallels precisely the appellee's thinking in the present case.

> <u>Armstrong also contends that the warrantless search violated the Fourth Amendment because the officer</u> admitted prior to the search that he <u>suspected the car may contain contraband.</u> Thus, <u>Armstrong contends that the officer conducted an illegal investigatory search</u> without a warrant under the guise of an inventory search.

754 S.E.2d at 654 (emphasis supplied). Notwithstanding that charge, the Georgia Court of Appeals did not hesitate to hold the inventory search there to have been valid.

> Because <u>evidence showed that the impoundment of the car was lawful</u> and that <u>the search was conducted in good faith pursuant to standard police department procedure for a valid inventory purpose</u>, the trial court's denial of the motion to suppress was supported by the evidence and will be affirmed on appeal.

754 S.E.2d at 655 (emphasis supplied).

A similar claim that a possibly investigatory purpose contaminated an otherwise proper inventory justification was rejected by the Massachusetts Appellate Court in <u>Commonwealth v. Baptiste</u>, <u>supra</u>:

> Even accepting the judge's inference or ultimate conclusion that Pagliaroni commenced the search of the vehicle while having some degree of an unfounded suspicion regarding the substance he had earlier observed on the center console, <u>his subjective beliefs would not render the inventory search impermissible.</u> See <u>Commonwealth v. Garcia</u>, 409 Mass. at 679, 569 N.E.2d 385, quoting from <u>Commonwealth v. Matchett</u>, 386 Mass. 492, 510, 436 N.E.2d 400 (1982) (<u>"fact that the searching officer may have harbored a suspicion that evidence of criminal activity might be uncovered as a result of the search should not vitiate his obligation to conduct the inventory"</u>).

34

841 N.E.2d at 739 (emphasis supplied).

The bottom line is that the two inducements for a search may live comfortably side by side. They are not antagonistic, and the additional presence of an investigative purpose will not erase the establishment of a solid inventory search justification. The undergirding truth is that the contemporaneous possession of two desiderata does not mean that one of them is a subterfuge. That, of course, would be the only reason for invalidating an otherwise valid inventory search. Such a reason does not exist in the present case. Once again, moreover, the appellee cites neither caselaw nor academic authority in support of his inherent cynicism.

## An Attitudinal Readjustment

One further word may be in order about the precedential limits of stare decisis. In arguing this appeal, the appellee relies pervasively on language from a trilogy of opinions filed by this Court, the first dating back over 40 years: Dixon v. State, 23 Md. App. 19, 327 A.2d 516 (1974); Manalansan v. State, 45 Md. App. 667, 415 A.2d 308 (1980); and Bell v. State, 96 Md. App. 46, 623 A.2d 690 (1993), aff'd, 334 Md. 178, 638 A.2d 107 (1994). Dixon, of course, we decided two years before the Supreme Court filed South Dakota v. Opperman (1976). Manalansan and Bell followed in the attitudinal slipstream of Dixon. The attitude of those opinions was extremely cynical about the very institution of the inventory search and overtly editorial in tone. They are cited, moreover, not for any legal analysis, but basically for their adverse comments on the police behavior in those cases. In now distancing ourselves from that tone, we refrain from using a word as harsh as

"repudiate," because the actual holdings of those cases were not necessarily incorrect as a matter of law. The attitude and the tone of the opinions, however, reflected a zeitgeist that is diametrically out of harmony with the now prevailing and more balanced understanding of inventory search law that has in more recent decades come of age.

**SUPPRESSION ORDER REVERSED AND CASE REMANDED FOR TRIAL. COSTS TO BE PAID BY APPELLEE.**